## McNEELY & PRICE CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 6777.

Circuit Court of Appeals, Third Circuit.

Sept. 21, 1939.

Roy Martin Boyd, of Philadelphia, Pa., for petitioner.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, and Laurence A. Knapp, Ruth Weyand, Alan F. Perl, Mortimer B. Wolf, and Bertram Edises, all of Washington, D. C., Attys., National Labor Relations Board, for respondent.

Before MARIS and CLARK, Circuit Judges, and KIRKPATRICK, District Judge.

CLARK, Circuit Judge.

This appeal relates to an order of the National Labor Relations Board directing the reinstatement of individuals who had participated in a sit-down strike. At the argument counsel for the Board admitted that the case would be governed by the ultimate decision of Fansteel Metallurgical Corp. v. National Labor Relations Board 7 Cir., 98 F.2d 375, then argued, but undecided, in the Supreme Court. In spite of this concession, after the handing down of the opinion in National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, counsel for the Board has filed a supplemental memorandum attempting to distinguish the case at bar.

The futility of relying on differences rather than distinctions is possibly "caviare to the general" but is certainly hornbook to the barrister. We realize that in the ordinary case this might be said to be an amiable weakness in which a bar, anxious for and perhaps in need of victory, indulges itself. Here we think the gesture is more than idle. It is harmful to both the National Labor Relations Board and to a wise solution of the problem of collective bargaining. We think it hurts the Labor Board because our decision must reemphasize a mistake on their part. We say mistake not in the sense of a failure to see eye to eye with the majority of the high court in interpreting a rather ambiguous statute. Such disagreements are constant in cases where the legislative words are intended generally and predictably and the contingency is particular and unexpected.

In this instance, the discord goes, we think, deeper. It is not assenting to Mr. Dooley's famous characterization to say that courts should take into consideration their duty and ability to lead (not follow) public opinion in directions consonant with the welfare of the democracy they serve. We do not have to be judicial Gallups to believe that the words of the distinguished Chief Justice are such a leading. We quote them: "* * * The seizure and holding of the buildings was itself a wrong apart from any acts of sabotage. But in its legal aspect the ousting of the owner from lawful possession is not essentially different from an assault upon the officers of an employing company, or the seizure and conversion of its goods, or the despoiling of its property or other unlawful acts in order to force compliance with demands. To jus-

tify such conduct because of the existence of a labor dispute or of an unfair labor practice would be to put a premium on resort to force instead of legal remedies and to subvert the principles of law and order which lie at the foundations of society." National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 495, 83 L.Ed. 627.

By the same token, we think the insistence upon this appeal is a disservice to the best interests of the "labor movement" and so a disservice to the national life of which it is such a vital part. Articles in two recent (1937–38) law reviews, McClintock, Injunctions Against Sit-down Strikes, 23 Iowa Law Review 149, The Relative Status of the Sitdown Strike in the Development of Labor Law, 23 Virginia Law Review 799 (note), give a bibliography of the sit-down strike in this country. See, also, Buisson, L'Occupation Des Usines Et Le Droit Francais, Rev. des deux mendes, Nov. 1936, Serie 8, 236, pp. 35–50. One of the learned authors, Professor McClintock, observes: "Last spring the air was electric with discussions of sit-down strikes, in which the strikers stayed at their posts instead of walking out. On the one hand it was asserted that labor had discovered a new tactic which at last enabled it to cease work without quitting the job and had thereby added immeasurably to its bargaining power; on the other hand, fears of the final breakdown of law and order and the protection of rights of property were widely proclaimed and the situation was regarded as so portentous that many who had publicly deplored the recent rapid extension of federal power into fields formerly left to state control, demanded that the President take some action to curb the use of this new weapon, though the preservation of internal law and order had always been regarded as the one subject matter which was most clearly within the exclusive control of the states. Six months later we find that both hopes and fears have subsided. The use of the sit-down tactic in strikes has been found to result in disadvantages that in many, if not most, strikes outweigh its advantages, not the least of the disadvantages being the antagonism of public opinion. Sit-down strikes are now of comparatively rare occurrence instead of being in progress in a score of places at once. For this reason, fears of their disastrous consequences to our government have been allayed. A discussion of the relation of sit-down strikes to the law is not now so timely as it would have been a short time ago, but for that very reason it may be possible to consider it more calmly and to weigh the various conflicting interests with less passion." Injunctions Against Sit-down Strikes, 23 Iowa Law Review 149.

The other learned writer phrases it thus: "These decisions (sustaining the Wagner Act, National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1 [57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352]) should have two effects on the sitdown situation. First, by giving the Wagner Act greater scope and the National Labor Relations Board wider power and a consequently greater opportunity to adjust labor difficulties, the pressing need of labor for a sanction to enforce its right to organize and bargain collectively, free from interference by employers, is almost totally removed. Thus the need for sit-downs is correspondingly lessened. Second, with the Federal Government assuming broad jurisdiction over labor conditions, it will be forced either to a legal recognition or denunciation of the sitdown. It seems that, in view of the now lessened need for the power of the sitdown, the government would logically make it illegal. Further, since sitdowns are even more obstructive of interstate commerce than walkouts, the Supreme Court's holding that the Federal Government could regulate labor because strikes impede such commerce would almost seem to force action against the sitdown. Thus a survey of the evidence would seem to justify a conclusion that the sitdown, in addition to its present common law illegality, will be expressly outlawed by Congress in the near future." The Relative Status of The Sitdown Strike In The Development Of Labor Law, 23 Virginia Law Review 799, 815 (note).

To these summaries, we believe that all friends of labor and, more than that, labor itself, say amen. Our regret is that the National Labor Relations Board does not seem conscious of their accuracy.

We began this opinion by suggesting the entire absence of a distinction. We might almost have gone further and have questioned the presence of a difference. There seem to be two dissimilarities in fact. In the case at bar, (1) the employing company did not make any gestures of discharge at the time its employees refused to vacate its tanning factory; (2) the em-

ployees did not violently resist the mandatory injunction of the state court of common pleas.

We used a deprecatory expression in our reference to discharge or lack of it. In the Fansteel case the company's counsel "appeared at the barricaded doors demanding admittance". When the demand was refused he announced in a loud voice that every man remaining in the buildings "was discharged for the violent seizure and retention of the buildings", Fansteel R. 1780-1, Hart and Pritchard, The Fansteel Case: Employee Misconduct and the Remedial Powers of the National Labor Relations Board, 52 Harvard Law Review 1275, 1282. Here the company's counsel either does not appear to have been consulted or else it did not occur to him that the courts would lay so much stress on the formalities of notice. At any rate, the only indication of an expressed intention to discharge is rather left-handed and is the implication that both former employees and new applicants are in the same status.

As we have intimated, we should have been of like mind with petitioner's mythical legal adviser. It is true that some of the courts considering the sit-down question have fastened on the matter of the discharge. They have done so in an apparent effort to construe the word "employee" as contained in Section 2(3), 29 U.S.C.A. § 152(3). As the learned authors, Professor Hart and Research Fellow Pritchard, of the review article above cited, 52 Harvard Law Review 1275, point out, the judges composing the majority in the Fansteel case do this sub silentio. The United States Supreme Court majority, speaking through Chief Justice Hughes, do name the section and give their reasons for not considering it binding in favor of "sit-downers". We bear a different relation to our high court from that of our learned authors above referred to. We refrain accordingly from any comment on their views. They are to be found at pages 1309–1318 (52 Harvard Law Review 1275) of the above cited article. Similar animadversions from the studies of their brethren of the coif may be found in contemporary journals and specifically, The Fansteel Decision: Protection of Striking Workers Under the Wagner Act, 33 Illinois Law Review 187 (comment), Nathanson and Lyons, Judicial Review of the National Labor Relations Board, 33 Illinois Law Review, 749, Weisinger, Restatement of Sit-Down Strikers, 23 Minnesota Law Review 30. As we read the opinion of the distinguished Chief Justice, it places the decision of the Supreme Court on a broader and what seems to us, at least, a more satisfactory ground, namely, the effectuation of the purposes of the Act, Section 10(c), 29 U.S.C.A. § 160(c), Hart and Pritchard, The Fansteel Case: Employee Misconduct and the Remedial Powers of the National Labor Relations Board, 52 Harvard Law Review 1275, 1318. The precise words of the opinion are as follows: "We repeat that the fundamental policy of the Act is to safeguard the rights of self-organization and collective bargaining, and thus by the promotion of industrial peace to remove obstructions to the free flow of commerce as defined in the Act. There is not a line in the statute to warrant the conclusion that it is any part of the policies of the Act to encourage employees to resort to force and violence in defiance of the law of the land. On the contrary, the purpose of the Act is to promote peaceful settlements of disputes by providing legal remedies for the invasion of the employees' rights. Elections may be ordered to decide what representatives are desired by the majority of employees in appropriate units as determined by the Board. To secure the prevention of unfair labor practices by employers, complaints may be filed and heard and orders made. The affirmative action that is authorized is to make these remedies effective in the redress of the employees' rights, to assure them self-organization and freedom in representation, not to license them to commit tortious acts or to protect them from the appropriate consequences of unlawful conduct. We are of the opinion that to provide for the reinstatement or reemployment of employees guilty of the acts which the Board finds to have been committed in this instance would not only not effectuate any policy of the Act but would directly tend to make abortive its plan for peaceable procedure." National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 497, 83 L.Ed. 627.

The second factual disparity between the two cases is, in our judgment, even less tenable. The damage to petitioner's property, owing to its particular character, could be and was accomplished by sins of omission rather than of commission. We have ritualistic authority for their classification in pari passu. We imagine, further-

more, that an owner is as averse to having his hides spoiled by neglect as to having them cut to pieces by knives. The lack of other violence is, on the strike-leader's statement, attributable to their fearing the state court more than they did the cockroaches who were their companions in the plant. We prefer to think that this gentleman's views are not those of his fellow workers and to ascribe their failure to attack the court officers to a respect for the agencies of justice (a respect notably lacking in the occurrences at the Fansteel plant in Chicago; Fansteel Metallurgical Corp. v. Lodge 66, 295 Ill. App. 323, 14 N.E. 991). One can hardly, however, call a departure from the employer's property under such circumstances anything more than a failure to continue violence—a fortunate failure, otherwise human beings as well as property are then in conflict.

We have spoken of respect for the agencies of justice. We are quite cognizant of the bad example set by a certain brand of employer. To that type the Wagner Act came not as a step in an attempted solution, but rather as an unwarranted interference with his right to regard labor as a commodity. So naturally, he uses every means permissible and not permissible to question its validity and to prevent its application and operation. The reports of the National Labor Relations Board and of the various Circuit Courts of Appeals contain the proof of this. It is that employer attitude which has led the learned authors of the article thrice referred to, 52 Harvard Law Review 1275, to express the hope that the Supreme Court majority did not intend to prescribe all "employee misconduct" as a bar to reinstatement. They indicate a qualification in an ascertainment of the relation between the conduct (or rather misconduct) and the provocation thereto, saying: "The key to a solution of this tripartite problem lies in a standard which would seek to distinguish between familiar or expectable responses to provocative unfair labor practices and individual or group excesses which, under the circumstances of the time and place, cannot fairly be said to have been expectable. Such a standard would seek to judge the conduct of the men by the provocation under which they acted. It would substitute for a subjective moral judgment as to what conduct abstractly should be "approved" a relatively objective judgment as to what conduct, as a matter of experience, was to be expected. It would satisfy the requirement of protecting the normal sanctions of the Act by leaving the employer subject to the risk of expectable conduct. It would satisfy the requirements of discouraging employee lawlessness, and avoiding its aggravation when it occurs, by placing the strikers' jobs in jeopardy rather than declaring them irrevocably forfeited. While thus preventing employers from provoking violence to their own advantage, on the one hand, it would prevent the employees from responding with unbridled license on the other. Thus it would operate in each case in the area most susceptible to effective control." Hart and Pritchard, The Fansteel Case: Employee Misconduct and the Remedial Powers of the National Labor Relations Board, 52 Harvard Law Review 1275, 1326–1327.

Maybe so, but we might add the caution that such latitude of interpretation gives the courts what amounts to legislative power. Maybe they are better qualified to exercise it. It just happens that the draftsmen of our system of government thought not.

As we are trying to avoid the exacerbation of which we accuse the National Labor Relations Board, we shall no more dwell on this petitioner's activities than we did on those of its antagonistic employees. Suffice it to say that the petitioner company seemed to flourish under or suffer from, depending upon the point of view, family and absentee ownership. As a result, its labor relations were in charge of supervisory employees, a chief tanner and his assistant. The latter two finally got into labor difficulties and had to call in their principals. Thereupon the family showed themselves as belonging quite clearly to the brand of which we have spoken. They referred to outside unions as "racketeering organizations", threatened to liquidate their business, and assisted in the conduct of a quite crude election. Worse, there was some evidence, at least, that the material support forbidden by the Act was offered in rather unpleasant form.

The order of the Board insofar as it orders the reinstatement of the individuals participating in the sitdown strike is modified and in all other respects it is affirmed.