### UNITED BISCUIT CO. OF AMERICA v. NATIONAL LABOR RELATIONS BOARD.
#### No. 7935.

Circuit Court of Appeals, Seventh Circuit.

June 17, 1942.

Frank G. Raichle, of Buffalo, N. Y., and Harry A. White and Edward H. Fiedler, both of Chicago, Ill., for petitioner.

Bernard Bralove, Robert B. Watts, and Ernest A. Gross, all of Washington, D. C., for respondent.

Before SPARKS, MAJOR, and MINTON, Circuit Judges.

MAJOR, Circuit Judge.

This is a petition to review a decision and order of the National Labor Relations Board entered against petitioner on January 31, 1942. Petitioner, a Delaware corporation, with its principal place of business in Chicago, Illinois, operates plants in eleven states, where it is engaged in the manufacture, sale and distribution of biscuits, crackers and cookies. The only plant involved in the instant proceeding is located at Buffalo, New York, generally known as the Ontario Biscuit Division. The complaint was issued upon charges preferred by Bakery and Confectionery Workers' International Union of America, Local 431, The Bakery, Tea, Coffee, Yeast & Pretzel Drivers' Union, Local 264, and Auto Mechanics Union, Local 1053, I. A. of M. Local 431 included petitioner's production employees; Local 264, its drivers, shippers and city salesmen, and Local 1053, its maintenance and repair workmen.

The Board found that petitioner, in violation of Section 8(5) of the National Labor Relations Act, refused to bargain collectively with each of the three locals; that it discriminatorily discharged a group of salesmen, members of Local 264, and refused to reinstate, upon application, a group of production workers, drivers and shippers in violation of Section 8(3), and that petitioner interfered with, restrained and coerced its employees in the exercise of rights guaranteed by Section 7 of the Act, thereby violating Section 8(1). The Board further found that a strike called on September 26, 1940, by the three locals was caused and prolonged by petitioner's unfair labor practices.

In conformity with such findings, the Board ordered petitioner to cease and desist from its unfair labor practices; upon request to bargain with the three locals involved; to reinstate with back pay from October 3, 1940, the salesmen found to have been discriminatorily discharged; to reinstate with back pay from October 23, 1940, those who were found to have been discriminatorily refused reinstatement on and after that date, and placing on a preferential hiring list those for whom employment was not available.

There appears to be little, if any, occasion to relate the evidence upon which the Board predicates its findings as to unfair labor practices on the part of the petitioner, for the reason that petitioner makes no contention but that there is testimony in support of the Board's findings in this respect. In fact, petitioner's sole attack in this court is upon that portion of the Board's order which requires back pay. In this connection, petitioner calls our attention to what it alleges to be a fact, that subsequent to the hearing and prior to the entry of the Board's order, it, in the interest of all concerned, offered reinstatement to all former employees and suggests that, by reason thereof, the order which directs reinstatement is moot. Assuming that reinstatement has been offered, we do not think that this militates against enforcement of the Board's order, provided it is otherwise valid.

While there is nothing before us except the validity of the Board's order directing back pay, a consideration of the issue thus presented necessarily requires some consideration of the circumstances preceding the strike called by Locals 431, 264 and 1053 on September 26, 1940, as well as the circumstances surrounding the discharge of the salesmen on October 3, 1940.

Organizational activities of petitioner's production employees by Local 431 commenced in October, 1937. Between that time and September 26, 1940 (the date of the strike), numerous disputes and controversies took place between petitioner and the members of this local, from which the Board found that petitioner violated Section 8(1) of the Act. The Board also found that petitioner refused to bargain collectively with the three unions, although each represented a majority of the employees in an appropriate unit. As already stated, there is no contention that these findings are not supported by substantial evidence, and we see no occasion to review the facts relative thereto. At this point, it is pertinent to observe, however, that the findings as to refusal to bargain with Local 264 are confined to the city salesmen,

as will more clearly appear in our subsequent discussion.

■ Subsequent to the strike, petitioner employed workmen to take the place of the strikers. The validity of the back pay order, so far as it pertains to the members of Local 431, and the drivers and shippers of Local 264, is dependent largely upon whether application for reinstatement was made on October 23, 1940, as found by the Board. This further involves the question as to whether petitioner was obliged to replace those employed subsequent to the strike in order to make room for the strikers. This is dependent upon the propriety of the Board's finding that the strike was the result of petitioner's unfair labor practices. In other words, we understand the law to be that where a strike is the result of the employer's unfair labor practices, then it must reinstate the strikers upon application, even though to do so necessitates the removal of those who have been employed in the positions formerly occupied by the strikers.

As to the strike by Local 431, no serious contention is made but that it was the result of unfair labor practices as found by the Board. We think the evidence supports the Board's finding in this respect. So as to the members of this local, the validity of the back pay order is dependent solely upon the question as to whether an application for reinstatement was made. As to the drivers and shippers (members of Local 264), it is contended by petitioner that the strike on their part was in violation of an employment contract which it had with petitioner and that the strike, as to these employees, was not the result of an unfair labor practice as found by the Board. If the Board's finding in this respect is sustained, these employees are in the same position as members of Local 431—that is, their right to back pay is dependent upon whether an application for reinstatement was made. As to the members of Local 1053, (two in number) the Board found that the strike on their part was the result of petitioner's unfair labor practices, which finding is not seriously controverted and, we think, is supported by the evidence. The right of back pay as to these two employees is also dependent upon the Board's finding that an application for reinstatement was made. As to those members of Local 264 (city salesmen), the back pay order is dependent solely upon the Board's finding that such employees were discriminatorily discharged October 3, 1940. It is the contention of petitioner that there is no substantial evidence to support this finding and that these employees were legally discharged.

The most serious controversy confronting us is the validity of the Board's order that the strike on the part of the drivers and shippers was the result of petitioner's unfair labor practices. In 1937, petitioner entered into collective bargaining negotiations with Local 264 representing its drivers. As a result of such negotiations, a written contract was entered into on January 15, 1938, which, among other things, provided that the Union—"* * * hereby agrees to protect the Company against all strikes by members of the Union, providing the provisions of this contract are lived up to." On July 1, 1940, petitioner entered into a written contract with the same local covering the shippers, which contained an identical provision. Admittedly, these contracts were in effect at the time of the strike. (It will be observed, as shown in the discussion to follow, that the city salesmen do not claim to have been members of this local until a few days prior to the strike.)

Previous to the strike, one Carlson, business agent for the production workers (Local 431), demanded recognition for the employees in that unit and notified petitioner that unless his demands were met, a strike would be called on September 27. Without giving the petitioner any further or different notice, the strike, on behalf of this local, was called on the morning of September 26. At the same time, a strike was called by one Smith, business agent of Local 264, without notice to petitioner and without submitting the matter to the members of the local which he represented. Petitioner argues that the strike on behalf of this local was entirely sympathetic and in violation of the contractual provision mentioned heretofore, while the Board contends and found that the strike was because of petitioner's unfair labor practices. The reasons assigned for this contention, however, are somewhat obscure. The only witness who attempted to assign a reason for the strike by this local was business agent Smith, whose testimony is so indefinite and uncertain, as well as evasive, that we would have difficulty in sustaining a finding predicated thereon. Notwithstanding, the Board found: "* * * It is clear that the respondent's unfair labor

practices and the belief concerning a company union, connected with these unfair labor practices, persuaded the drivers and shippers that such unfair labor practices were directed against them in common with the other employees and were a substantial cause of the strike of the shippers and drivers represented by Local 264. * * *"

■ The unfair labor practices mentioned in this finding were not directed at the drivers and shippers, and it is not found that the strike was caused by petitioner's effort to organize a company union, but merely the "belief concerning a company union." The Board did not find that the strike was caused by any unfair labor practices directed at the drivers and shippers; neither did it find that petitioner had breached the employment contract which it had with them. There is no dispute but that Carlson and Smith, on the night preceding the strike, met and agreed to call it the next morning. That fact was stipulated at the hearing. We are of the opinion that the circumstances demonstrate well nigh conclusively that the strike on behalf of this local was in sympathy for the unfair labor practices directed at the other local unions.

■ Assuming, however, that our conclusion in this respect is erroneous, and accepting the Board's finding as to the cause of the strike by this Union, the further question is presented as to whether the reason found is such as to justify the breach of the provision in the contract by which the Union agreed "to protect the company against all strikes by members of the Union." The Board did not find, nor does it argue, that there was no breach of contract by the Union. It stated in its decision: "The Board does not condone breaches of contract," and in the next sentence stated: "But under the circumstances of this case, we cannot agree with the respondent's contention that the drivers and shippers should not be ordered reinstated with back pay." If the order of reinstatement with back pay was not a complete condonation of the Union's breach, then we do not know how that result could be accomplished. In a footnote in its decision, the Board suggests that questions arising from breach of contract are technical common-law issues, not germane to the instant proceeding, and, as we understand, are to be treated by the laws of the state having jurisdiction over actions for breach of contract. We reject the contention that a

breach of contract between an employer and a Union is irrelevant to the rights and obligations of the contracting parties. We see no reason why the parties to such a contract should not be bound by its provisions, charged with the obligations imposed and entitled to the benefits provided in the same manner and to the same extent as the parties to any other character of contract. Especially is that true of a contract entered into in good faith, and there is no contention here to the contrary. It is also pertinent to observe that no question is raised but that a Union has a right to agree to a provision, such as the one here in controversy, as the result of collective bargaining with the employer.

Holding as we do that the strike by Local 264 was in violation of this contractual provision, it follows that it was without legal justification. We must then determine whether the Board's back pay order as to the drivers and shippers can be sustained in view of this situation.

■ Petitioner relies strongly upon National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682. In this case, the Supreme Court affirmed the Circuit Court of Appeals in its holding that the employer did not violate the Act by refusing to bargain with the employees after they had gone on a strike in violation of their contract with the employer. The court, on page 344, of 306 U.S., on page 514 of 59 S.Ct., 83 L.Ed. 682, said: " * * * Respondent rightly understood that the men were irrevocably committed not to work in accordance with their contract. It was at liberty to treat them as having severed their relations with the company because of their breach and to consummate their separation from the company's employ by hiring others to take their places. The Act does not prohibit an effective discharge for repudiation by the employe of his agreement, any more than it prohibits such discharge for a tort committed against the employer. * * *"

The Board contends that this holding is inapplicable since the breach in the instant case was caused by petitioner's unfair labor practices. We doubt if the language is to be so limited, but even so, as we have pointed out, there were no unfair labor practices directed at the drivers and shippers. It is true, petitioner did not actually discharge the employees for this breach, and we need not decide whether the relation of employer and employee was actually ter-

minated. The breach, so we think, exonerated the petitioner from the obligation of bargaining further with this Union on behalf of the drivers and shippers, and it was not required to displace new employees in order to make room for those who had breached their contract. This conclusion finds support also in National Labor Relations Board v. Fansteel Corp., 306 U.S. 240, pages 260, 261, 59 S.Ct. 490, 498, 83 L.Ed. 627, 123 A.L.R. 599, wherein the court pointed out that a group of employees designated as aiders and abettors had not been actually discharged, but nevertheless held that the Board's order for reinstatement would not "effectuate the policies" of the Act. In the instant case, we are of the view that the reinstatement of those who admittedly breached their contract will not effectuate such policies.

The Board's order also directed reinstatement with back pay for fifteen of petitioner's city salesmen found to have been discriminatorily discharged October 3, 1940. While business agent Smith of Local 264 had spoken to petitioner regarding recognition of this Local as bargaining agent for the salesmen, it is admitted that a majority of them had not signed application for membership in such Union until September 20. Thereafter, on September 23, Smith informed petitioner of such designation and asked that Local 264 be recognized as their collective bargaining representative. Smith was informed by petitioner's superintendent that he "would be glad to talk to him about it" as soon as petitioner was "out of the situation concerning the factory workers" and Local 431. Admittedly, this was the only discussion prior to the strike which occurred three days later. The Board found that petitioner's attitude amounted to a refusal to bargain in violation of the Act. In view of what followed, we see no occasion to determine the validity of the Board's order in this respect.

■ The salesmen did not strike on September 26 as did the other employees, including the drivers and shippers, members of the same Union which the salesmen had so recently joined. They remained on petitioner's payroll until the date of their discharge. It is petitioner's contention that they failed and refused to perform their duties as salesmen—in other words, they were disloyal to petitioner—and that this was the reason for their discharge. As stated, the Board found to the contrary.

It would serve no good purpose to enter into a discussion of the conflicting testimony concerning their duties, the instructions given them by petitioner, and the manner in which they performed the same. We shall content ourselves with the observation that there is merit in petitioner's contention. There is no doubt but that the salesmen consulted with business agent Smith as to the best course for them to pursue after the strike was called. That their sympathies were plainly with the strikers, as might naturally have been expected, was disclosed. They had the undoubted right to strike with their fellow employees, but they had no right to remain as employees unless they were willing to perform their duties wholeheartedly and efficiently. The record is persuasive that they did neither.

■ If the validity of the Board's finding was dependent entirely upon the testimony as to the manner in which they performed their duties, we would find great difficulty in sustaining it. Such, however, is not the case. In addition to the testimony in this respect, there is also testimony which the Board accepted, that both prior to their discharge and subsequently, their efforts to organize and their affiliations with the Union were criticized and condemned by petitioner's supervisory officials. They were urged to abandon their membership in the local and warned that petitioner would not permit a Union salesman to work for it. After their discharge, petitioner sought to induce some of them to return to work provided they would forego their membership in a Union. While we think petitioner had plausible grounds for their discharge, we are unable to hold that the Board's finding they were discriminatorily discharged is without substantial support. In view of this situation, it follows that the Board's order as to reinstatement and back pay for the salesmen must be approved.

We now consider the Board's finding that application for reinstatement was made October 23, 1940, on behalf of the members of Locals 431 and 1053. We have heretofore sustained the Board's finding that the strike by these locals was due to petitioner's unfair labor practices. In view of our holding concerning Local 264 (drivers and shippers), there is no occasion to determine whether or not a proper application for reinstatement was made on their behalf. It is petitioner's contention that the finding

of the Board concerning the application for reinstatement is without substantial support; that, at most, the application was conditional and that a valid application required an unconditional offer to return to work on behalf of all the locals in controversy upon the same terms and conditions existing at the time of the strike.

Between October 23, 1940, when the first meeting was held, and December 1, 1940, when the last meeting was held, more than a score of conferences took place between representatives of the petitioner and representatives of the involved locals. Usually, if not always, Local 264 was represented by its business agent Smith, and Local 431 by its business agent Carlson. Local 1053 was represented at these conferences for the first time on November 20, 1940, by its business agent Wiesner. During all this time a picket line was maintained by the strikers, and we think it is an accurate statement that the primary purpose of the numerous conferences was to effect a settlement of the strike.

■ We now consider the testimony which the Board finds constituted an application for reinstatement on behalf of the strikers. While the Board fixed the date of the application as October 23, 1940, it relies upon statements and conversations which took place at different meetings. We have difficulty in following the Board's position in this respect and are of the view that what was said at the different conferences must be considered separately in determining whether or not an application was made at a particular time. In other words, an application made on the installment plan will not support a finding that it was made as of the date of the first installment.

The Board found that on October 23, 1940 (the first conference), Smith and Carlson met an official of petitioner's outside the plant, when Smith inquired: "Why don't we put these people (meaning the strikers) back to work and forget everything?" Carlson also stated: "To take all my people I had on the picket line, take them back and let's forget about the whole affair." In view of the fact that the record does not disclose how many of the strikers were on the picket line, or how those on the picket line were divided among the three locals, we do not see how these statements, by any stretch of the imagination, could be considered as applications for reinstatement, and especially is this true insofar as it pertains to the statement of Carlson as the agent of Local 431.

The next meeting discussed by the Board occurred on October 31, 1940, wherein Smith inquired of petitioner's representative: "How soon they could get together and get this thing straightened out, get some sort of a settlement. Well, will you put our people to work and forget the whole thing?" No representative of Locals 431 nor 1053 was present at this conference and, of course, Smith was only authorized to speak for Local 264. The next meeting discussed by the Board, wherein any alleged application for reinstatement was made, occurred on November 20, 1940. At this meeting was present Smith and Carlson and, for the first time, Wiesner, as the representative of Local 1053. According to the finding of the Board, Wiesner asked petitioner's representative: "In the interest of the whole thing and trying to settle this whole question, how about putting all our people out in the street back to work?" and it was further found that this request was joined in by Smith and Carlson. Wiesner further testified, in effect, that this offer was not conditional upon any of the other disputes then under discussion.

■ While we think this evidence, at the most, furnishes no more than feeble support for the Board's argument that this constituted an unconditional application for reinstatement, we are not prepared to say it is insufficient under the circumstances. There can be no doubt but that petitioner's position was, on that date and subsequently, that it would not reinstate the strikers insofar as it required a discharge of those employed to take their place. Petitioner was not justified in this position insofar as it pertained to Locals 431 and 1053, for the reason that they were on strike as the result of petitioner's unfair labor practices. Furthermore, as late as November 24 and December 1, 1940, petitioner insisted that it would bargain with Local 431 for its members only. This, in itself, was an unfair labor practice, as under the Act it was required to bargain with this Union on behalf of all employees in the appropriate unit. McQuay-Norris Mfg. Co. v. National Relations Board, 7 Cir., 116 F.2d 748, 751. Under these circumstances, petitioner's argument is not impressive that the request made on November 20, 1940, did not constitute applications for reinstatement, when, at that time and subse-

quently, it was insisting upon conditions for terminating the strike which were, in themselves, violative of the Act.

There isn't a scintilla of evidence, so far as we can ascertain, in support of the Board's finding that application for reinstatement was made on behalf of the members of Local 1053 prior to November 20, 1940. In fact, as already stated, this was the first meeting in which Wiesner, as the representative of that local, participated. In view of what we have said, we also must hold that there is no substantial evidence to support a finding that application for reinstatement was made on behalf of Local 431 prior to that date.

We therefore decide that the Board's order which requires back pay for the drivers and shippers (members of Local 264) must be eliminated. Furthermore, the Board's order which requires back pay from October 23, 1940, for the production workers (members of Local 431) and the maintenance and repair workmen (members of Local 1053) must be modified so as to provide back pay only from November 20, 1940.

The petition for enforcement, modified in conformity with these views, is allowed.