## NATIONAL LABOR RELATIONS BOARD v. DORSEY TRAILERS, Inc.

### No. 12750.

United States Court of Appeals
Fifth Circuit.

Jan. 30, 1950.

T. Lowry Whittaker, Chief Legal Officer, National Labor Relations Bd., Atlanta, Ga., A. Norman Somers, Asst. Gen. Counsel, National Labor Relations Bd., Washington, D. C., David P. Findling, Assoc. Gen. Counsel, National Labor Relations Bd., Washington, D. C., for petitioner.

Bentley G. Byrnes, New Orleans, La., for respondent.

Before HUTCHESON, Chief Judge, and HOLMES and McCORD, Circuit Judges.

HUTCHESON, Chief Judge.

Based upon findings that respondent had engaged, and was engaging, in unfair labor practices, the Board, one member dissenting as to a portion of the order, ordered respondent to cease and desist therefrom, and to take affirmative action,[1] and by this petition seeks enforcement of that order.

The respondent denying the commission of unfair labor practices, insists that not it, but the union and the employees are to blame for the difficulties and troubles attending the relationship between it and them. Not at all denying its obligations and responsibilities under the act, but insisting that it has fully complied with them, respondent urges upon us that enforcement be denied.

Not an ordinary run of the mill Labor Board case, where contested issues are determinable and determined upon conflicting testimony, this case comes here on a record containing little dispute of fact and presenting questions largely of law.

The first of these is, was the shutting down of the plant for four days in May, 1946, because of the strike by the employees, without first resorting for redress to the grievance procedures provided for in their contract, an unfair labor practice entitling the men to pay for the time of the shut down. The Board insists that it was, the respondent that it was not.

The second is, is there any substantial support in law or in fact for the Board's finding that, in not reinstating Nevels et al., the three employees who had been active in bringing on and maintaining the illegal strike of November 19th, the company committed an unfair labor practice against them. The Board insists that there is, respondent that there is not.

The third question is, was it the duty of respondent to resume bargaining with the union after the illegal strike in November was over and the men came back to work so that its failure to do so was an unfair labor practice.

The fourth is, did the respondent, with the purpose of interfering with the right of its employees to select their representative, have a responsible part in the attack on International Representative Harden.

A statement of the undisputed facts material to these issues will serve to point these questions up. In the spring of 1945, the union was certified as bargaining agent for the employees. In September, 1945, a contract for the period of one year was signed by the union and the company. This contract contained a provision for grievance procedures, but unlike the second contract, it contained no specific non-strike provision.

In February, 1946, following a fire at the plant, and the recommendation of the Insurance Bureau that the company should prohibit promiscuous smoking about the plant, respondent posted a "no smoking" rule.

On April 29th, an employee by the name of Robbins was given a two day lay off for smoking. James Nevels, chairman of the union's grievance committee, then blew the whistle for stopping work, and all the employees walked out of the plant in protest of the disciplinary action taken against Robbins.

There is no proof as to whether Robbins was, or was not, a union member, and

---

[1]. (1) to reinstate and make whole Jim Nevels, Ben Logan and Leavy Boutwell; (2) to make whole employees locked out on or about May 7, 1946; and (3) upon request, bargain collectively with International Union, United Automobile, Aircraft and Agricultural Implement Workers of America Local 773 C. I. O.

no claim was, or is, made that Robbins was discriminated against because of union activities.

The following day, Harden, International Representative of the union, deprecating the strike, advised respondent that the employees were willing to return to work immediately. Dorsey, for the management, replied that because of their defiance, they would be laid off for two weeks. Harden, not disagreeing with Dorsey's view that the action of the employees had been wrongful, argued that the penalty was too severe.

Later that same day, the union's grievance committee and Harden met with Dorsey at the request of the union. The union, admitting that the employees were in the wrong, but arguing that a lay off of two weeks was too severe a penalty, a compromise was reached whereby the employees were to be laid off for the balance of that week, and the second week would be held in abeyance.

The union did not thereafter further resort to the grievance or arbitration procedure provided in the 1945 contract, or make any complaint about the four days lay off until on June 16, 1947, when, after a complaint had been filed on other charges and the hearing had been postponed, it was included in a third amended charge, belatedly filed more than two years after the occurrence of the matter complained of.

A new contract, effective September 26, 1946, was thereafter executed, containing a conditional non-strike agreement to the effect that a strike would not be resorted to without fully exhausting grievance procedures.

On November 19th, without resorting to grievance procedures, a strike vote was taken and an illegal strike was called. Because of the interruption of work caused by the calling off of the men on the four o'clock shift to take the strike vote, Prescott, for the respondent, told Nevels, for the union, that there would be no use having the night shift report, that the company was calling off that shift for that night, but that the men could report next day.

Nevels, although a majority of the members had voted against the strike, ordered the night shift to report to work, if work was refused to demand two hours pay, and if this demand was refused, to picket the plant.

Upon Prescott's replying to the demand of the night shift for two hours' reporting pay, that he could not give an immediate answer, pickets were posted around the plant and there remained until November 26, 1946, when the union addressed to the respondent an unconditional offer to return to work immediately. To this offer of the union the respondent replied at length, advising that because of conditions fully set out, including the disruption and uncertainty caused by the strike, it would be unable at that time to put the men to work and resume operations or say when they would be resumed.

Thereafter one Reynolds, acting as president of the union, though then under suspension, scheduled a union meeting for December 17th, and at that meeting 110 votes were cast to disband the union and 11 against such action.

By letter of December 18th, Reynolds advised respondent of the action taken and requested cancellation of the 1946 contract. Respondent acknowledged the letter, and in reply outlined the history of its dispute with the union, and accepted cancellation of the contract.

On December 30th, respondent announced that the plant would reopen on January 6th, and at the same time notified some 100 employees to report for work on that day.

At the same time respondent mailed to Nevels, Logan, and Boutwell, the three leaders of the illegal strike, a postal card, reading: "Dear Sir: While it is proposed that operations will be resumed on Monday, Jan. 6th, materials are not available in sufficient quantities to resume full production schedule. In view of this fact, you should not report to work unless you receive notice to do so."

On Dec. 31st, Nevels, et al., went to the respondent to file grievances because they had not been notified to report to work.

The respondent insisted that because of the breach of the contract and the illegal strike, it did not recognize the contract as any longer in force, and it could not and would not discuss or accept grievances under it. The union, however, persisted in its attempts to file these and other grievances, and on January 11th, a final meeting was held which resulted in a definite statement by respondent that it did not, and could not, any longer recognize the union, and the matter was then taken to the Board.

 The Board, one member dissenting, determined contrary to the finding and recommendation of the examiner, that the May shut down of the plant was not justified but was an unfair labor practice, that the law gave the employees the right to strike on account of grievances and that without regard to whether the strike was or was not justified, since the contract contained no non-strike clause, respondent had no right to keep the plant shut down after the men had offered to return.

We cannot agree with this view. We think the examiner and the dissenting member, Mr. Gray, were right, the Board wrong. When a contract, made with a union, provides for grievance procedures, and the union, without resorting to these procedures, arbitrarily causes a strike, it ought not to be, we think it is not in law, an unfair labor practice for the employer to impose a reasonable discipline for the breach of the contract. But whether or not this would ordinarily be so, it was settled here between union and respondent, by resort to grievance procedures, that the discipline would be imposed, and it is beyond the duty, if not the power, of the Board to unsettle it.

The Board itself is a mere creature of the law. It is no "Poo Bah" to loose or bind at will. In attempting to put at loose a matter which employees and employer have by lawful procedures put at rest, the Board, we think, exceeds its authority, goes beyond its powers, and, doing so, it sets a pattern of profiting by ones own wrong, which is just as immoral and inequitable in labor as in any other human relations.

██ Upon the issue as to the three employees, Nevels et al., the Board finds: the strike in November was illegal; that the employer was not required to take these persons back since they had gone out on an illegal strike in breach of contract; and that if respondent had taken a firm position and had stayed firm on not reemploying the three, there would have been no unfair labor practice. It finds, though, that, because the union signed the letter stating willingness to return to work and the company replied, saying that the plant could not ·reopen until later without then saying that the instigators and leaders of the unlawful ·strike would not be taken back, this was a condonation of the actions of some of those responsible for the strike, and, in effect, a reinstatement of them, and that the failure thereafter to call them back to work was an unfair labor practice.

We cannot at all agree with the Board that this conclusion is supported either in fact or in law. If we could agree with their view that respondent did not make it clear from the beginning to these three that they·would not be treated differently from the rank and file of the workers, we could not agree with it that this would be a waiver of their breach of ·contract, and a condonation of their wrong headedness, their injurious and harmful action both to the company and to the employees.

In support of this view, the Board stands merely upon its own pronouncement. It cites no authorities. We have found none. We think none can be found. But, however this may be, the record leaves in no doubt that the Board's view, that Nevels et al., were led by respondent to believe that they would be taken back along with the rest, finds no support whatever in the record.

As shown above by Nevels' resort to grievance procedures to have the company reinstate him, Nevels and the other two knew from the beginning that the respondent had determined not to reinstate them and sought in vain to make a grievance of this action. It comes with poor grace, it finds no support in the record, for the union to now claim, and the Board to now find, in favor of these men, that they were

misled and lulled into a sense of false security and then long afterwards illegally discriminated against, when the second amended charge declares that on November 19, 1946, respondent locked its employees out, and on and after December 30, 1946, it refused to, and has since refused to, reinstate them.

■ Upon the third question, whether their failure to bargain with the union was an unfair labor practice, we think it clear that the examiner, in his carefully worded and clearly presented conclusions, has correctly analyzed the record and correctly pointed out, upon the undisputed proof, that the Board did not sustain the burden of proving that the union represented a majority of the employees after the return of the men to work from the strike so as to make its refusal to bargain with the union an unfair labor practice.

The facts which the examiner sets down in support of this conclusion are uncontradicted, the inferences he draws are the necessary inferences required by those facts. Without, therefore, further lengthening this opinion by quoting from his report, we refer with approval to what is said therein at pages 94, 95, 96 and 97, of the Record.

■ There remains only the question of the assault upon Harden. We agree with examiner and Board that the company, while not directly responsible for the attack, was certainly cognizant of it and could have prevented, but did nothing to prevent it, and that such conduct certainly constituted an unfair labor practice. Though, therefore, the assault was an isolated instance of that kind of interference, it was, in itself, conduct interfering with the employees' rights guaranteed in Section 7 of the Act, 29 U.S.C.A. § 157, and should be enjoined.

The enforcement of the order of the Board will, therefore, be denied, except that an injunction will issue directing respondent, Dorsey Trailers, Inc., "to cease and desist by attacks upon, or other such interferences with union members or representatives, from restraining, or coercing its employees in the exercise of the right

to self organization, to form labor organizations, to join or assist International Union United Automobile, Aircraft and Agricultural Implement Workers of America, Local 773, C. I. O., or any other labor organization to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the Act."