## NATIONAL LABOR RELATIONS BOARD v. KINGSTON CAKE CO., Inc. et al.

### No. 10932.

United States Court of Appeals Third Circuit.

Argued March 3, 1953.

Decided July 17, 1953.

Marcel Mallet-Prevost, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Mark C. Curran, Atty., National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Max Rosenn, Wilkes-Barre, Pa. (Harold Rosenn, and Solomon Lubin, Wilkes-Barre, Pa., on the brief), for Kingston Cake Co., Inc.

R. Lawrence Coughlin, Albert N. Danoff, Wilkes-Barre, Pa., for Kingston Mut. Assn.

Before McLAUGHLIN, STALEY and HASTIE, Circuit Judges.

STALEY, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order requiring the employer to offer reinstatement to its former employee, Franklin Williams, and, jointly and severally with the union, to make Williams financially whole, and to post the related notices. The case has been here before [1] at which time we remanded

1.  3 Cir., 1951, 191 F.2d 563.  The board's original decision appears in 1950, 91 N.L.R.B. 447.

in order to have the board pass upon a question which we deemed essential. The board has done so and again seeks enforcement. Even though we had the case before, a rather full exposition of the facts is necessary because of the view we take of the matter.

Since 1946 there had been competition between the Kingston Mutual Association and the Bakery and Confectionery Workers, AFL, for the position of exclusive bargaining representative of the company's employees. Williams, whose discharge is here in issue, except for a term of military service and a short period with another employer, had worked for the company since 1941. In 1946, the Pennsylvania Labor Relations Board conducted a representation election which was won by the association. Williams supported the bakery workers in the campaign preceding this election. After that election, Williams lent his support to the association and was later elected a member of the Employee Board, representing his fellow employees in the shipping department. In January of 1947, the association entered into a two-year contract with the company. Upon the expiration of that contract in January of 1949, Local 423 of the bakery workers filed a representation petition with the board. In the campaign preceding this election, Williams again espoused the cause of the bakery workers. In order that the association could get on the ballot, it was necessary that its officers execute and file with the board the non-Communist affidavits required by Section 9(h) of the Act.[2] On January 17, 1949, all the officers of the association received blank affidavits from the association secretary-treasurer and were requested to sign them. Williams said that he would take his home and would think about signing it. The next day all the other officers had executed their affidavits and returned them except Williams who refused to sign his, stating that, by so doing, he hoped to keep the association off the ballot and, eventually, to bring about its downfall, thus enabling the bakery workers to prevail. On January 19, the as-

sociation officers suspended him from its Employee Board. Thereafter, the Employee Board charged him with a violation of the association's bylaws and set a hearing for January 22. At some time before the hearing, however, Williams changed his mind and decided to execute an affidavit. Having lost the one originally given him, he obtained another from the business agent of the bakery workers, executed it, and gave it to the secretary-treasurer of the association on January 22, immediately prior to the meeting. He was told that this form was no good because it was an old one, but he was not asked to execute another form, nor did he offer to do so. The January 22 hearing was indefinitely postponed because of the absence of counsel for the association.

Williams' suspension having enabled the association to comply with the filing requirement of Section 9(h), the representation election was conducted by the board on February 3, and the association won.

The association and the company executed another two-year contract. This contract contained a union-shop clause, necessitating a union-security election under Section 9(e) of the Act.[3] The board conducted such an election on March 24, and almost 90 per cent of the employees voted in favor of the union-security clause. The board's field representative revealed the results immediately after the election, but formal certification did not come until May 16.

Following the representation election, the association officers again considered the charges against Williams and decided to prosecute despite Williams' offer to execute a new affidavit. A hearing was held on March 21, but decision was reserved until April 12, when Williams was expelled from the association. On April 19, the company was officially notified of that fact. The company having taken no action pursuant to the notification, counsel for the association wrote the company on April 25, as follows:

"Having notified you by letter of April 19, 1949, of the action taken by

---

2. 61 Stat. 143 (1947), as amended, 65 Stat. 601 (1951), 29 U.S.C.A. § 159(h).

3. 61 Stat. 143 (1947). The 1951 amendment dispensed with union-security elections.

the Kingston Mutual Association in the case of Mr. Frank Williams, I now wish to direct your attention to Article II, Paragraph 4, of the Labor Agreement presently in effect between the Kingston Mutual Association and the Kingston Cake Co., Inc., and request that you take appropriate steps in line therewith."

On April 26 counsel for the company answered in the following language:

"* * * I am of the opinion that Kingston Cake Company cannot take any action under Article II, paragraph 4 of the agreement between it and the Union, unless the membership of Mr. Williams is terminated for failure to tender periodic dues and initiation fees required by the Association."

On April 29 counsel for the association replied:

"I have your letter of April 26, 1949, and with reference thereto, I wish to advise that in addition to the failure of Mr. Williams to sign and execute a non-communist affidavit, as required under the Labor Management Relations Act of 1947, he also failed to tender or pay the nominal dues as required for membership in the Kingston Mutual Association for the month of March, 1949.

"It is the belief of the officers of the Kingston Mutual Association that by his failure to pay or tender the periodic dues, his membership in the association was terminated, and therefore the employer is required under the terms of the labor agreement presently in effect between the Kingston Mutual Association and the Kingston Cake Company, Inc., to dismiss the said employee, Franklin Williams, from his employment with the Kingston Cake Company, Inc. * * *"

On May 9, Williams was called into the company office and was handed the following letter:

"We regret to inform you that we are obliged to terminate your employment effective at the close of work today for the following reasons:

"1. We are informed that your membership in the Kingston Mutual Association has been terminated for your failure to sign a non-communist affidavit in connection with recent proceedings before the National Labor Relations Board, and your failure to pay or tender the periodic dues required by it. Under our agreement with the Kingston Mutual Association we are required, therefore, to sever your employment at once.

"2. Apart from your membership in the Association, your failure to sign the non-communist affidavit has caused considerable distress among the employees of the Company, and has been a source of so much agitation that the normal harmonious relations existing among them has been affected. Under such circumstances, we feel that you will find employment elsewhere happier. * * *"

The trial examiner and the board found that the company had discharged Williams at the association's behest because of his nonmembership in the association. The discharge was on May 9, and formal certification of the union-shop election did not occur until May 16. Therefore, the trial examiner and the board concluded that the company had violated Section 8(a) (3) and (1) [4] of the Act by discharging Williams in

4. "(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7; * * *

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in

this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization * * * to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the

reliance on a union-shop clause one week before that clause became formally valid. The same facts formed the basis of the conclusion that the association had coerced the company to discharge Williams, in violation of Section 8(b) (2) and (1)(A).[5] The board, however, deemed it unnecessary to pass upon the trial examiner's further finding "that Williams' alleged dues delinquency could not have been the basis for the Union's demand on the Company that he be discharged and, further, the Company was aware of this fact at the time."

This was the state of the record when the case came here for the first time. Unwilling to predicate enforcement upon the technical prematurity of the discharge, we remanded the case so that the board could pass upon the trial examiner's finding that the alleged dues delinquency was not the real cause of the union's demand that Williams be discharged and that the company knew that fact at the time. This finding would sustain a charge that the company and the association had violated Section 8(a) (3) (B) [6] and (b) (2), respectively, regardless of whether or not they had acted one week too soon. Upon remand, the board agreed with the trial examiner on

that point. Solicitous of our concern over the propriety of the exercise of its discretion, the board stated a third ground for its conclusion: Even if it be assumed that Williams' failure to tender the periodic dues had been the real cause of his expulsion from the association and consequent discharge by the company and even if he had been discharged after the board had formally certified the results of the election, the two respondents still would have been in violation because the discharge would have been based upon a failure to tender dues at a time when there was no duty to do so, that is, before formal certification of the validity of the union-shop clause.

The company's principal contention on this supplemental petition for enforcement is that the inevitable bad blood which arose between members of the association and Williams, following his traitorous conduct, led to such disruption of harmony within the plant that, to protect production, it was necessary to fire Williams. At this stage of the case, however, we are not going to disturb findings of fact. While the evidence was not all in the board's favor, we cannot say that the record, considered as a whole, does not support the board's

employees as provided in section 9(a), in the appropriate collective-bargaining unit covered by such agreement when made; and (ii) if, following the most recent election held as provided in section 9(e) the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to authorize such labor organization to make such an agreement * * *." 49 Stat. 452 (1935), as amended, 61 Stat. 140 (1947), 29 U.S.C.A. § 158 (a) (1) and (3) (1947).

5. "(b) It shall be an unfair labor practice for a labor organization or its agents—
   "(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 of this title * * *
   "(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic

dues and the initiation fees uniformly required as a condition of acquiring or retaining membership * * *." 61 Stat. 140 (1947), as amended, 65 Stat. 601 (1951), 29 U.S.C.A. § 158(b) (1) (A) and (2).

6. "(a) It shall be an unfair labor practice for an employer— * * *
   "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * * Provided further, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization * * * (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership * * *." 49 Stat. 452 (1935), as amended, 65 Stat. 601 (1951), 29 U.S.C.A. § 158(a) (3) (B).

findings as to the real cause of the discharge.[7]

[■] Because of our theory of ▪he case, it is unnecessary to detail the various contentions of the parties. We accept the board's findings of fact. Thus, the case amounts to this. An officer of one union, in an effort to break up that union and, indirectly to aid another, refused to execute the non-Communist affidavit required by the Act, for the sole purpose of keeping the first union off the ballot in a pending representation election. The perfectly natural effect of his conduct was that he was expelled from that union, which, having been successful in the representation election and having sustained its position in a following union-security election, brought pressure to bear upon the employer and succeeded in having the employee fired. The board then asks that we decree enforcement of its order requiring reinstatement and back pay. We refuse to do so for the reason that we cannot see that such a decree would, in any way, effectuate the policies of the Act.

We take it that by this time certain fundamentals of our national labor-management policy are settled beyond dispute. The objective of Congressional intervention in the field of labor relations was to prevent obstructions to the free flow of interstate commerce by promoting industrial peace. Each of the regulations and procedures set up by the National Labor Relations Act was directed to that one end. The primary means to bring about that end was to foster the process of collective bargaining between representatives of management and labor. In order to foster collective bargaining, it was thought necessary that employees be completely free in their organization and choice of bargaining representative. If citation of authority is needed for these propositions, it appears in the express language of the National Labor Relations Act. Section 1 states, in part:

"It is declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 49 Stat. 449 (1935), as amended, 61 Stat. 136 (1947), 29 U.S.C.A. § 151.

See also National Labor Relations Board v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

As part of the statutory scheme to insure complete freedom of choice in selecting a bargaining representative, Section 9(c) of the Act provides for a representation election by secret ballot. This provision contemplates freedom of opportunity for each candidate to get on the ballot, assuming that it has satisfied the filing requirements of the Act. The purpose of Section 9(h) was to protect the public interest in the free flow of interstate commerce against the dangers of political strikes instigated by Communists who might subordinate legitimate trade-union objectives to obstructive strikes. American Communications Ass'n, C. I. O. v. Douds, 1950, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925. "The purpose of § 9(h) was to stop the use of the Labor Board by union leaders unwilling to be limited in government by the processes of reason. That purpose was sought through the elimination of such leaders rather than by making difficult the union's compliance with the Act." National Labor Relations Board v. Dant, 1953, 344 U.S. 375, 385, 73 S.Ct. 375, 381, 97 L.Ed. ——. It obviously was not included in the 1947 amendments

---

7. 48 Stat. 926 (1934), as amended, 29 U.S. C.A. § 160(e). Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456;

National Labor Relations Board v. Pittsburgh Steamship Co., 1951, 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479.

to enable a union officer to deliberately shut off from the orderly processes of the Act the members of his union.

Of course, we realize that Sections 8(a) (3) (B) and (b) (2) now give protection to employees engaging in dual unionism, which may be defined as advocacy of one union while maintaining membership in its rival. Its essence, however, is persuasion directed to a change in affiliation and bargaining representative. While it may be anathema to the hardened union man, it was protected in the interests of making absolutely free the choice of representative—free even from union coercion based upon a valid union-security clause. We think, however, that what we have here is not the kitchen-garden variety of dual unionism which is to be sanctioned. Conduct which seeks to persuade a man's fellow workers that they should agree with his choice of bargaining representative is one thing. Conduct which, while it may have the same ultimate purpose, effectively precludes any choice of bargaining representative is another. The intended effect of Williams' refusal to execute the non-Communist affidavit was to shut off entirely from the orderly processes of the Act those employees who favored the Kingston Mutual Association. It was not persuading them to choose as Williams thought best. It was, because of his unique status in the association, preventing them from choosing at all. He attempted to bring about a one-candidate ballot. That leaves no choice in the electorate. We find

no fault with dual unionism, but the homely principle that the end does not justify the means is still good law as well as good morals. Williams' use of the sanctions imposed by Section 9(h) of the Act for the clear purpose of foreclosing to his fellow employees the opportunity to make any choice in their selection of a bargaining representative constituted a prostitution of the Act, in utter derogation of the primary means established by Congress to effectuate the principal objective of the Act. Although the conduct of the company and the association in this case was a violation of those provisions of the Act which Congress thought would protect the individual employee in his right of free choice of bargaining representative, at most, however, it would only remotely interfere with the freedom of choice, whereas Williams' conduct constituted a direct, frontal attack upon the principal means established by the Act to insure the individual his freedom of choice. To reinstate with back pay an employee guilty of such a perversion of the Act would breed contempt for it rather than effectuate its policies.[8]

It may be said that Williams' plan did not succeed. The answer is obvious. It was not his fault that it did not succeed. It was purely fortuitous that the association was able to suspend him in time to comply with the filing requirements of Section 9(h) and, thus, to be entitled to a place on the ballot.

---

**8.** Our refusal to enforce this order is consistent with a long line of cases beginning with National Labor Relations Board v. Fansteel Metallurgical Corp., 1939, 306 U.S. 240, 257–258, 59 S.Ct. 490, 83 L. Ed. 627, 123 A.L.R. 599. The following are representative of the principle of that case. Southern Steamship Co. v. National Labor Relations Board, 1942, 316 U.S. 31, 48, 62 S.Ct. 886, 86 L.Ed. 1246; National Labor Relations Board v. Kelco Corp., 4 Cir., 1949, 178 F.2d 578, 580–581; National Labor Relations Board v. Indiana Desk Co., 7 Cir., 1945, 149 F.2d 987, 995; United Biscuit Co. of America v. National Labor Relations Board, 7 Cir., 1942, 128 F.2d 771, 776; McNeely & Price Co. v. National Labor Relations Board, 3 Cir., 1939, 106 F.2d 878, 880; Mackay Radio and Telegraph

Co., 1951, 96 N.L.R.B. 740, 743. A larger collection of cases appears in 155 A. L.R. 885 (1945). The reasoning behind these cases, despite their diverse factual settings, is that reinstatement of employees who conduct themselves in a manner inimical to the Congressional plan of peaceful and orderly settlement of labor-management problems will not effectuate the policies of the Act.

Ordinarily, we would enforce the notice provisions of the order even though denying reinstatement and back pay. We will not do so here, however, since the board itself found, in its original order, that a broad cease and desist order was not necessary in view of the long history of the respondents' scrupulously neutral attitude.

■ We do not rely on any maxim of "clean hands," because the doctrine does not apply since this is a proceeding by a governmental agency seeking enforcement of its order in the public interest. Republic Steel Corp. v. National Labor Relations Board, 3 Cir., 1939, 107 F.2d 472, 479, modified on other grounds, 1940, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6. See also National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 872, certiorari denied, 1938, 304 U.S. 576, 585, 58 S.Ct. 1046, 82 L.Ed. 1540. The "benefits" of the board's remedial processes run to the public. The fact that an individual employee may also benefit is a means to the more important end of industrial peace. We are convinced, however, that reinstatement of Williams with back pay would set "* * * a pattern of profiting by one[']s own wrong", which is just as immoral and inequitable in labor as in any other human relations." National Labor Relations Board v. Dorsey Trailers, Inc., 5 Cir., 1950, 179 F.2d 589, 592.

We turn now to the question of our power to deny enforcement. It was phrased as follows in National Labor Relations Board v. Eanet, 85 U.S.App.D.C. 371, 179 F.2d 15, 20. "Does the court have a modicum of judicial discretion in passing upon this petition for an enforcement decree? Or is it required to put the stamp of its authority automatically upon whatever request is made of it?"

■ We are quite aware that administration of the Act was conferred upon the board and not upon judges of the courts of appeals. The Act is administered by a group of men whose constant, day-to-day touch with the problems of labor relations gives them a unique feeling for the appropriate solutions to the novel questions in the field. For this reason, their solutions are weighty when questioned before judges who are, usually, without that comforting familiarity. That principle has been distilled into the following, concrete rule: "When the Board, 'in the exercise of its informed discretion,' makes an order of restoration by way of back pay, the order 'should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.'" National Labor Relations Board v. Seven-Up Bottling Co., 1953, 344 U.S. 344, 346–347, 73 S.Ct. 287, 289, 97 L.Ed. ——. See also Virginia Electric & Power Co. v. National Labor Relations Board, 1943, 319 U.S. 533, 540, 63 S.Ct. 1214, 87 L.Ed. 1568.

■ We said recently, however, that "We approach the problem presented by the Board's petition for enforcement with the well-settled rule in mind that 'The powers conferred upon this court by the National Labor Relations Act to enforce the orders of the Board are equitable in nature and may be invoked only if the relief sought is consistent with the principles of equity.'" National Labor Relations Board v. Globe Automatic Sprinkler Co., 3 Cir., 1952, 199 F.2d 64, 70. Thus, while the board's discretion in ordering affirmative action is wide and should not lightly be disturbed, it has its limits. Certainly, a court of appeals has some responsibility for the effects of its own decree; this is especially so where it appears that enforcement would entail subversion, rather than effectuation of the legislative purpose. Furthermore, we are convinced that this is not a case in which administrative expertise is of compelling weight. It is not a problem of such great technicality that only experts can untangle it. "* * * [H]e is no friend of administrative law who thinks that the Commission should be left at large." Mr. Justice Frankfurter, dissenting in Federal Trade Commission v. Motion Picture Advertising Service Co., 1953, 344 U.S. 392, 406, 73 S.Ct. 361, 369.

The petition for enforcement will be denied.

HASTIE, Circuit Judge (dissenting).

The behavior of employee Williams, as revealed in this record, is as unappealing to me as it is to my colleagues. But under the pertinent provision of the Labor-Management Relations Act, I cannot see that the board acted improperly in ordering his reinstatement.

The court concedes the propriety of the board's finding that the employer discharged Williams at the union's behest be-

cause of his non-membership in the union, even though the employer knew that Williams had been deprived of his union membership for reasons other than non-payment of dues. But in Section 8(a) (3) (B) of the National Labor Relations Act as amended by the Labor-Management Relations Act, 1947, Congress has expressed a policy decision that in a union shop situation no cause of dismissal from the union other than non-payment of dues shall justify the union in calling for the employee's discharge under its union security contract or the employer in yielding to the union's insistence. Unquestionably the tactics Williams employed to thwart the union while he was one of its officers were disloyal and unfair. But the very fact that this is what provoked his fellow workers to act to remove him not only from the union but from the shop as well makes both what the union demanded and the employer's responsive action discharging Williams unfair labor practices under the present Act. The board so concluded and I think the court agrees with that conclusion.

Yet, this very sequence of events which made the discharge of Williams legally indefensible is now said to make the board's action in directing his reinstatement an abuse of discretion. With this I am unable to agree. It seems to me that what the board did implements the very policy which Congress has adopted in Section 8(a) (3) (B). Perhaps this case indicates the unwisdom of a policy which protects the job security of one ousted by his fellow workers from their union for *any* reason other than non-payment of dues. But Congress has written that broad protection into the law and in my view it stands as the authoritative expression of public policy for this type of situation.

The court avoids this conclusion by pointing to general objectives of the whole body of federal labor relations legislation which would be impeded by enforcement of the particular policy which I find embodied in Section 8(a) (3) (B). I suspect this means no more than that the point of view represented by the original Wagner Act is not wholly consistent with some of the more recent thinking of Congress embodied in the Taft-Hartley Act. But I do not reach that point. I find a clear and specific policy in Section 8(a) (3) (B) which justifies the board's action without reference to the broad general conceptions out of which the National Labor Relations Act emerged.

Finally, nothing like the foregoing considerations applies to National Labor Relations Board v. Fansteel Metallurgical Corp., 1939, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599 and the cases which follow it. Therefore, I do not join in the court's thinking that the Fansteel line is authority for the present decision.

I think the order of the board should be enforced.