**NATIONAL LABOR RELATIONS BOARD v. OERTEL BREWING CO. et al.**

No. 11442.

United States Court of Appeals
Sixth Circuit.

May 29, 1952.

T. J. McDermott, Washington, D. C., George J. Bott, David P. Findling, A. Norman Somers, and Frederick U. Reel, all of Washington, D. C., on brief, for petitioner.

Grover G. Sales, Herman Cohen, Louisville, Ky., for respondents.

Grover G. Sales, Louisville, Ky., on brief, for Oertel Brewing Co.

Herman Cohen, Louisville, Ky, for Carpenters Dist. Council of United Brotherhood of Carpenters and Joiners of America, AFL.

Before SIMONS, Chief Judge, and ALLEN and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

The National Labor Relations Board, claiming that the Oertel Brewing Company had discharged four employees belonging to a Machinists' Union, CIO, from an installation job, because of a strike threat from a Carpenters' Union, AFL, above named, petitioned for enforcement of its order directing the company to cease and desist from discouraging membership in the Machinists' Union or in any labor organization of its employees, or encouraging membership in the Carpenters' Union, or in any other organization of its employees, by discharging any of its employees or discriminating in any other manner in regard to their hire, tenure, or conditions of employment, in violation of Section 8(a) (3) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 158 (a) (3). The Board also directed the company to cease and desist from interfering with, restraining, or coercing employees in the exercise of their rights in violation of Section 7 of the Act. 29 U.S.C.A. § 157. In addition, the Board directed the Carpenters' Union to cease and desist from causing, or attempting to cause the company to discharge or otherwise discriminate against its employees because of their nonmembership in the Carpenters' Union, in violation of Section 8(b) (2) of the Act, 29 U.S.C.A., Section 158(b) (2); and further directed the company and the Carpenters' Union, jointly and severally, to make the said discharged employees whole for any loss of pay due to the discrimination against them up to the date of the completion of the installation job; and to post appropriate notices.

Respondent Oertel Brewing Company contends that there was no evidence to sustain the Board's finding that it had violated the Act in discharging the four employees; that the installation job in question was required by contract with the Machinists' Union to be completed on a given date; that, since the job was not completed by that date, the contract expired and the employees of the Machinists' Union were, therefore, discharged from further work on the job. Respondent Carpenters' Union likewise contends that the four employees of the Machinists' Union were discharged from the job because of the expiration of the contract and not because of any pressure brought upon the company by the Carpenters' Union.

With respect to the background of the controversy, it appears that in 1948, the company entered into a collective bargaining agreement effective April 6, 1949, with the Machinists' Union covering certain of its maintenance employees. While operating under this bargaining agreement, and in the course of negotiating a new contract, the parties extended the terms of the old agreement until July 6, 1949.

The collective bargaining agreement provided that: "The erection, making, repairing, assembling and dismantling of all machinery, * * * shall be performed by qualified employees who are in accord with the articles of this agreement and a part of the Union." It further provided that the Machinists' Union, upon request of the company, would furnish competent help, if possible, and that any person so employed by the company, after thirty days, would be obliged, as a condition of continued employment, to become a member of

and remain a member in good standing of the Machinists' Union. In April, 1949, the company determined upon the addition of a new bottle line, which necessitated the installation of machinery; and on April 15, the Machinists' Union advised the company that, in accordance with the terms of its current agreement, the union would be able to furnish a sufficient number of skilled machinists to complete this installation. However, in May, before hiring any employees for the work, the company was notified by the Carpenters' Union, with whom it had no agreement, that unless members of its union were employed, or unless an independent contractor—who would hire none but members of its union—were engaged, the Carpenters' Union would picket the company's plant. However, the company decided that under the terms and spirit of its contract with the Machinists' Union, it would be doing that organization an injustice not to "grant them jurisdiction on that work." Accordingly, when work was begun on the installation of the new machinery on June 8, 1949, three members of the Machinists' Union were hired, and a fourth member was hired on June 21. In addition to this work, the company also hired ironworkers for the job, the other employees engaged therein being electricians, plumbers, and pipe fitters. All workers on the installation job, with the exception of the machinists, were members of craft unions affiliated with the AFL. On June 10, two days after the installation began, the Carpenters' Union, in protest against the hiring of members of the Machinists' Union, placed a picket in front of the company's plant, carrying a placard which stated: "Oertel Brewing Company is unfair to Fall Cities Carpenters District Council."

With the approach of July 6, the expiration date of the collective bargaining contract between the company and the Machinists' Union, counsel for the company was in daily contact with the Carpenters' Union in a vain attempt to persuade it to withdraw the picket line. While the picketing did not result in any interference with the operations of the company's plant, it appears that the AFL craft unions in Louisville, where the company was located, had 30,000 members, while the Machinists' Union included about 3,000 members. As the secretary of the company stated, it was treading on thin ice by having an AFL picket line in front of the plant, with other AFL men working on the job constructing buildings, and the company also feared that the members of the Bartenders' Union might, because of the picketing, refuse to buy the beer manufactured by the Oertel Company.

When, on July 6, the contract with the Machinists' Union expired, representatives of other AFL craft unions informed the company that they would not be responsible for the electricians, steam fitters and plumbers belonging to their union that worked at the Oertel Brewery. Counsel for the company, however, continuously urged the representatives of the Carpenters' Union to permit the four members of the Machinists' Union to complete the job, pointing out that there were only a few days left before such work would be completed. This request, however, was refused. Other representatives of AFL unions also informed the secretary of the company that unless the work was closed down and the machinists laid off, they wouldn't be responsible for the conduct of the rest of the workers of their union that were being employed on the various other projects in connection with the brewery.

The evidence upon which the Board relied discloses that, as the result of this threat, the company closed down the entire installation job and discharged the four employees in question. On the following day, the Carpenters' Union removed its picket line; a new independent contractor was engaged to complete the installation, performing the work in six days, using the same crew that had worked prior to the closing down of the job, except that members of the Carpenters' Union replaced the four members of the Machinists' Union.

On the issue whether the discharge of the employees was because of their membership in the Machinists' Union, and nonmembership in the Carpenters' Union, and whether the Carpenters' Union caused such discharge, the credibility of the witnesses and the weight of the evidence

was for the Board. Of course, the evidence upon which the Board bases its decision must be substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Our review of the record discloses that the findings of the Board, that the discharges were in violation of the Act, were amply sustained by substantial evidence in the record, considered as a whole.

It is, indeed, to be said that the Oertel Brewing Company tried to treat the machinist employees with consideration and fairness, and, in its concern for a just solution of the controversy, went to great lengths in its attempt to persuade the Carpenters' Union not to attempt to force their discharge. But the Board found that in its efforts to avoid the threatened damage to itself, it had violated the provisions of the Act; and such a violation is not excused by the economic pressure that was exerted against it.

Respondents contend that the Board's order directing notices to be posted to effectuate the purposes of the Act, was improper, in requiring the statement to be therein set forth that they would not discriminate against the Machinists' Union or interfere with the right of self-organization of their employees. This argument is based upon the circumstance that since the filing of the unfair labor practice charge by the Machinists' Union, a new collective bargaining contract has been entered into between the Machinists' Union and the company in which construction machinists having the right of erection and assembly of equipment were eliminated from its provisions, so that a jurisdictional dispute such as that revealed by this record will not arise again. It further appears that the Machinists' Union, in consideration of the execution of such collective bargaining contract, sought to withdraw the charges made, but their request was denied by the Board. It is, therefore, submitted that because of these facts, the question of respondents' violation of the statute has become moot. However, the abandonment by an employer of a practice condemned by the statute does not cause a controversy under the National Labor Relations Act to become moot. Na-

tional Labor Relations Board v. Toledo Desk & Fixture Co., 6 Cir., 158 F.2d 426. The Board is entitled to entry of a decree enforcing its order, even though the order has been obeyed. National Labor Relations Board v. Bachelder, 7 Cir., 125 F.2d 387. See also National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831; National Labor Relations Board v. Oregon Worsted Co., 9 Cir., 96 F.2d 193. We are of the opinion that the question involved in this case is not moot.

In accordance with the foregoing, a decree will be entered enforcing the order of the Board.