NATIONAL LABOR RELATIONS BOARD
v. WHITTENBERG CONST. CO.

No. 11543.

United States Court of Appeals,
Sixth Circuit.

Nov. 28, 1952.

Edward D. Friedman, Washington, D. C. (George J. Bott, David P. Findling, A. Norman Somers, Frederick U. Reel and Thomas McDermott, Washington, D. C., on the brief), for petitioner.

Martin R. Glenn, Louisville, Ky. (Herman Cohen, Louisville, Ky., on brief), for respondent.

Before HICKS, ALLEN, and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

The issue in this case is whether substantial evidence on the record, considered as a whole, sustains the finding of the National Labor Relations Board that respondent denied employment to a number of workmen because of the fact that they were not members of a certain union, in violation of Section 8(a) (1) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1, 3).

Respondent, in June 1949, had entered into a contract with the Public Buildings Administration, Federal Works Agency, under the terms of which it was to place the Kentucky Ordnance Works, at Paducah, Kentucky, in a so-called "stand-by" condition. At the time the contract was entered into, electricians and pipe fitters, whose services were necessary for this government project, were on an area strike, and the beginning of work was postponed during settlement of the matter.

Before respondent company hired any employees, Charles Bryant, its superintendent in charge of this government project, met with the Paducah Building and Construction Trades Council, A. F. L. On this Council, the United Brotherhood of Carpenters and Joiners of America, A. F. L., known as the Carpenters' Union, was represented by Jodie Vaughn, its business agent. Various other A. F. L. craft unions were also represented by business agents on this Council. During the course of his meeting with the members of the Council, Bryant and the business agents discussed wages, conditions of employment, and the number of men to be employed on the project, including millwrights who were represented by the Carpenters' Union.

After the meeting of Superintendent Bryant with the members of the A. F. L. Council, Irwin Griffin, special organizer for the International Association of Machinists, herein called the I. A. M., told Superintendent Bryant that he had learned there would be considerable mill work at the project; that the I. A. M. had approximately 500 machinists available who were qualified to do the work, and that Griffin, as their representative, wanted them assigned to do the mill work. In the course of the conversation, Bryant learned that the I. A. M. was not associated with the A. F. L. Council, and thereupon told Griffin that if the machinists wanted jobs on the project, they would have to come through the Paducah local of the Carpenters' Union because of the fact that Bryant had an agreement with the Council to furnish him the workmen. Griffin replied that if that were the case, he was afraid

that not very many members of the I. A. M. would get any work on the job as there was little likelihood that they would be referred to the job by the Carpenters' organization. Bryant, however, suggested that Griffin meet with Vaughn, the business agent of the Carpenters' Union, and work out some kind of a compromise; and he expressed the fear to Griffin that if he were to hire members of the I. A. M., the Carpenters' Union would picket the project, as well as every job with which respondent was associated in Kentucky.

After this conversation with Superintendent Bryant, Griffin went to see Vaughn at his office and mentioned that he understood from Bryant that any men employed to do mill work on the project would have to be cleared through the Carpenters' Union at Paducah. Vaughn replied that this information was correct. Griffin then proposed that he submit to Vaughn the names of a number of machinists who were members of the I. A. M., and that for each carpenter millwright of the A. F. L. who was given work on the project, Vaughn would submit the name of one machinist. To this proposal, Vaughn replied that he already had all the men lined up who could be used on the project and refused to refer any machinists to the respondent company for such work. When Griffin reported this refusal of Vaughn to Bryant a few days later and asked whether he could send machinists out to see him directly, Bryant declined, stating that he was very sorry but that the machinists would have to come through the Carpenters' local because he had made an agreement with the A. F. L. and could not get out of it.

About a month later, on October 4, 1949, Superintendent Bryant employed George F. Downs as foreman in charge of the mill work for the project and delegated to him the full authority to hire all necessary personnel. Downs had been the millwright foreman when the machinery had been first installed at the plant in question and it was because of his experience on this particular job that Bryant sought him out at Cairo, Illinois—approximately thirty-five miles away—to take charge of this further work at the plant. Downs was a member of the A. F. L. Carpenters' Union. Bryant testified that he also had been a member of the A. F. L. Carpenters' Union for approximately thirty years, but, as a construction superintendent during twelve years in the past, he had not been required to pay dues. The day after Downs was employed as foreman by Superintendent Bryant, Bryant gave him written instructions to the effect that no men whom Downs contacted or hired were to be questioned about their affiliations with labor organizations, or whether they were members thereof. The day after receiving these instructions, Downs employed eight millwrights for the job. On October 12, 1949, he employed four additional millwrights; on October 24, six; on November 8, five; on December 12, six; on December 13, two; and on December 19, three. During this period, there were 500 employees of the Illinois Central Railroad Shop at Paducah, Kentucky, who are members of the Machinists' Union and who had been laid off on September 3, 1949. These men later returned to work with the railroad on November 15.

After the first hiring of the millwrights, Bryant informed Griffin of the hiring of Downs as foreman and stated that Downs had been instructed not to hire any man through either the Carpenters' local or the I. A. M. local, inasmuch as Griffin and Vaughn had failed to reach an agreement on their jurisdictional dispute. Griffin thereupon asked Bryant whether he could not refer I. A. M. members as individuals and let them "hire in as such." Bryant replied that such men could come out alone or in groups to the project but that they would not be interviewed in Griffin's presence. After this meeting with Superintendent Bryant, Griffin called Vaughn by telephone and stated that respondent was not hiring men from either the Carpenters' local or the I. A. M. local, but that Foreman Downs was hiring men from across the state line, in Cairo, and was not hiring men from their organizations. To this, Vaughn replied that Downs was a member of the Carpenters' Union "and he will look after our interests." Whether Vaughn meant that Downs would look after their

joint interests or only those of the Carpenters' Union is not clear.

It appears that members of the I. A. M. sought employment at the project on numerous occasions. On September 16, 1949, a few weeks before the work commenced, eight members of the Machinists' Union called on Superintendent Bryant at his home and their spokesman told him that they were all members of the I. A. M.; that they had learned Bryant would need men for the project; and asked him if he would accept their application for employment. At that time, Bryant refused to do so on the ground that because of the strike of the electricians and pipe fitters which was then in progress, no jobs were available. He declared, however, that when the jobs would be available later, these members of the I. A. M. should apply. After the above mentioned strike was settled, the spokesman for the Machinists' Union at this prior meeting asked Bryant if he could now use him, since the strike was over. Bryant stated that he could not, at that time, and suggested that he see him later. Subsequently, on several occasions, individual members of the Machinists' Union asked the superintendent for a job on the project during the period that workmen from the Carpenters' Union were, from time to time, being employed. The result of all these applications for employment was that members of the Carpenters' Union were hired a day or so before the members of the Machinists' Union presented themselves, or a day or so later, the members of the Machinists' Union being told that at the times they presented themselves, their services were not needed. A number of the members of the Machinists' Union not only renewed their applications from time to time during the period, but left their telephone numbers with respondent company. The respondent, however, did not communicate with any of the applicants who were members of the Machinists' Union. Altogether, there were fifty applicants for jobs on this project—sixteen were members of the Machinists' Union, and thirty-four were members of the Carpenters' Union. Respondent employed thirty-four workmen, all of them members of the Carpenters' Union.

Respondent submits that it clearly and expressly instructed its foreman not to make any inquiries as to the labor affiliations of any applicants presenting themselves for jobs; and the foreman testified that he had never asked any applicant whether he held a card in the Machinists' local or the Carpenters' local. He further stated that, although he was a member of the Carpenters' Union, he was a member of the Cairo local, and at no time paid dues to the Paducah local or consulted with the business agent at Paducah. He further declared that he personally knew half of the men he employed because they had previously worked with him. Superintendent Bryant stated that he told applicants from time to time that he was not accepting anyone sent out by the Carpenters' Union or Machinists' Union or any kind of union; that he did not care whether they belonged to a union or not, as long as they were qualified to do the work. Foreman Downs further stated that he had never attended a Carpenters' local meeting in Paducah in his life; that he had never asked a man his union affiliation; that he hired the workmen because he knew them to be qualified and that he was personally familiar with the ability of every man he had hired.

A certain amount of the evidence against respondent was disputed; but the important elements of the proofs sustain the conclusions of the Board. The credibility of witnesses is for the trier of the facts—in this case, the Board—and the reasonable inferences to be drawn from the evidence are likewise for the Board. The fact that all of the workmen employed were members of the Carpenters' Union, although a number of members of the Machinists' Union were making repeated applications during this period of employment, sustains the conclusion of the Board that, on the record as a whole, the members of the Carpenters' Union were being preferred to members of the Machinists' Union, and that the latter were being denied employment because of their labor organization affiliation. It might well be that Foreman

Downs employed these men because of his prior acquaintance with them and his knowledge of the quality of their work. He had been foreman at the plant when the machinery was installed, and he was brought back to be foreman when it was to be placed in a stand-by condition for future use. It, of course, might be natural for him to select the workmen with whom he was acquainted, on the basis of their ability as good workmen. But it was certainly within the proper province of the Board to draw conclusions, because of Downs' affiliations with the Carpenters' Union, as well as similar affiliations on the part of Superintendent Bryant and his conferences with the A. F. L. Council, that the members of the Machinists' Union were discriminated against in their applications for employment because of their labor organization affiliation.

In accordance with the foregoing, an order will be entered enforcing the order of the National Labor Relations Board.[1]

Judge Hicks participated in the hearing and decision of this cause, but died before the opinion was prepared.

1. In the order making the employees whole for any loss of pay they may have suffered, it was erroneously set forth that the date for computation of such loss of pay extended to February 12, 1951. It was agreed by the parties on the argument before the court that this date should be February 12, 1950.