### NATIONAL LABOR RELATIONS BOARD v. LOCAL 743, UNITED BROTHERHOOD OF CARPENTERS & JOINERS OF AMERICA.

No. 13157.

United States Court of Appeals
Ninth Circuit.
Feb. 18, 1953.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Frederick U. Reel, Abraham Siegel, Attys., N.L.R.B., Washington, D. C., and Charles K. Hackler, Atty., N.L.R.B., Los Angeles, Cal., for petitioner.

James M. Nicoson and Arthur Garrett, Los Angeles, Cal., for respondent.

Meserve, Mumper & Hughes, Los Angeles, Cal., for General Electric Co., amicus curiae.

Before MATHEWS, BONE and ORR, Circuit Judges.

ORR, Circuit Judge.

The National Labor Relations Board, herein petitioner, issued an order against Local 743, United Brotherhood of Carpenters and Joiners of America, A.F.L., herein respondent, pursuant to § 10(c) of the Labor Management Relations Act of 1947, 29

U.S.C.A. § 160(c), herein called the Act. We are asked to enforce the order.

General Electric Company was originally a respondent in this proceeding. Petitioner's order ran against it also but that company elected to comply; consequently, the Board withdrew its request for entry of an enforcement decree against it.

General Electric Company was engaged by Pacific Gas and Electric Company to install a series of steam turbine generators at its "Kern No. 2" plant, situated near Bakersfield, California. During the course of the operations General Electric employed fifteen installation machinists.

In the month of October 1949, six men, members of the International Association of Machinists, herein I.A.M., made application to General Electric for employment. These applications were made to one Roy Jones, a supervisor for General Electric Company. They were not given employment. At the time these applications were made installation of the last generator had not begun.

The general contractor on the installation operation for Pacific Gas and Electric Company was Stone and Webster. Jones conferred with representatives of Stone and Webster and was informed that they hired only craftsmen who were members of the Building Trades. Members of the I.A.M. were thus excluded. General Electric Company had a stated policy "to abide by the Wage and Hour agreements that existed on the job site;" and pursuant to such policy established for installation machinists the identical wage scale used by Stone and Webster.

The Board found that Jones, as supervisor for General Electric Company, made an oral agreement with one Duel Sceales, business agent of the Bakersfield local of respondent Union, to the effect that General Electric Company was to hire certain skilled employees, provided that it used as many members of the respondent Union as possible. All persons hired as machinists would be required to become members of the respondent Union, in disregard of the fact that such a union security agreement violated the provisions of §§ 8(a)(3), 9(a)

and 9(e) of the Act. 29 U.S.C.A. §§ 158 (a)(3), 159(a) and 159(e).

Conflicting evidence appears in the record. The Trial Examiner gave credit to the testimony of the members of the I.A.M. who had applied to General Electric Company for work. In doing so we think he properly exercised his function of determining credibility after, as he states, a consideration of the whole record.

Evidence credited by the Trial Examiner was in substance as follows: Witness Floyd E. Smith, an I.A.M. representative, asked Jones about jobs for I.A.M. men. Jones replied that employment of I.A.M. members would cause trouble with the Building Trades, but that if Smith could persuade one McGrew, superintendent for Stone and Webster, to establish a policy of hiring I.A.M. men, he, Jones, would go along.

Witnesses Crichton and Chidester, experienced machinists, applied to Jones for jobs and were interviewed by him. They informed Jones they were I.A.M. members. He informed them that although he had no job openings at the time he expected to need men in the future and was pleased to know he could get experienced men. Jones explained to them that it would be necessary for them to clear through respondent Union before he could hire them; that once they did that he would hire them. Jones explained that if he hired outside the respondent Union "the Building Trades would just get on his neck." Jones further promised the applicants that "when I send you over [to respondent Union] they will clear you for the job all right."

Witnesses James, Rose and Chandler also applied to Jones for jobs. He, Jones, informed them that he could use them. But, on learning that they were members of the I.A.M., he informed said witnesses that they would be required to clear through respondent Union. Jones described his agreement with Sceales, the business agent, and requested these witnesses to "make arrangements with him [Sceales] to either join the Carpenters' Union or get a permit from him."

Witnesses James, Rose and Chandler visited business agent Sceales at the head-quarters of respondent Union in Bakersfield, California. They informed Sceales of their interview with Jones. Sceales confirmed the agreement he had with Jones. He refused clearance to the men and informed them that they could not work on the Kern job "because he [Sceales] had men in his local who had been paying dues for quite some time and were out of work and that they were certainly going to be placed on the job before outsiders."

Respondent Union urges that the credited evidence is not sufficiently substantial to sustain the Board's finding that it caused General Electric Company to discriminate against applicants for employment in violation of § 8(b)(2) and § 8(b)(1)(A). 29 U.S.C.A. §§ 158(b)(2) and 158(b)(1)(A).

Section 8(b)(2) of the Act provides that it shall be an unfair labor practice for a labor organization "to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) * * *."

We agree with respondent that it is not enough to make out a case under this section "merely to prove that there has been discrimination on the part of the employer," but we do not agree that the substantial evidence relied on does no more than show discrimination. An agreement that only those employees who belong to a certain union, or who are referred by that union, which is in force and effect and which is of sufficient potency to cause a company to refuse to hire outside that agreement for fear the union will be "on its neck," most certainly comes within the terms of § 8(b)(2) and § 8(b)(1)(a), 29 U.S.C.A. §§ 158(b)(2) and 158(b)(1)(a), where, in referring men for work, the union discriminates in favor of its own members. Cf. N.L.R.B. v. Swinerton, 9 Cir., 1953, 202 F.2d 511. The statements made by Jones to the job applicants and confirmed by the statements subsequently made to them by Sceales point up a discriminatory agreement in force between General Electric Company and respondent and enforced by them, each acting with full knowledge and acquiescence that to get a "job" you either joined the respondent Union or received a referral from it.

Respondent further contends that it is not subject to the jurisdiction of the Board under the Act because "the subject of the instant controversy involved the installation of machinery in a plant located within the confines of California, the ultimate use being the generation of electric energy for use within the state, there being no showing that any of the energy thus produced is destined to be furnished out of the state or to any concern, itself engaged in a business affecting commerce." We think this statement does not take a sufficiently broad view of the operations of General Electric Company. The findings of the Trial Examiner point this up. We quote:

"General Electric Company, a New York corporation, has its principal offices and place of business in Schenectady, New York, where it is engaged, among numerous other enterprises, in the manufacture, sale, distribution, and in the installation of steam turbine generators in various states throughout the United States. GE also operates a large number of plants, scattered throughout the United States, which are engaged in the manufacture, sale, and distribution of machinery, electrical equipment, and appliances and related products, and in the repair and service thereof.

"During the year 1949, GE, in the operation of the aforesaid plants, caused to be purchased and delivered to each of the said plants, machinery, equipment, parts, and other merchandise valued in excess of $500,000, of which more than 50 per cent was transported to each of said plants from states other than the states in which the said plants are located. During the same period, GE manufactured, serviced, or repaired, at each of said plants, products valued in excess of $500,000 of which more than 50 per cent was transported from each of the said plants to states other than the states where the said plants are located.

\* \* \* \* \* \*

"The evidence, moreover, conclusively shows that (1) the steam turbine generator that was installed by GE for Pacific Gas and Electric Company near Bakersfield, California, was valued at upwards of several hundred thousand dollars and that the said generator was shipped by GE to the job site from one of its plants located outside the State of California, (2) the business and labor relations of GE are centrally controlled by GE from its Schenectady, New York, headquarters, and (3) the installment work in question was an integral part of GE's multistate business structure."

A decree will be entered enforcing subdivision II of the order of the Board as it relates to respondent Union. Enforcement of subdivision III of said order is denied. General Electric Company, in compliance with the order, has made whole the named applicants for jobs.