## EICHLEAY CORP. v. NATIONAL LABOR RELATIONS BOARD.
### No. 11003.

United States Court of Appeals
Third Circuit.

Argued June 4, 1953.

Decided Aug. 26, 1953.

800

Sherman T. Rock, Pittsburgh, Pa. (Theodore M. Burns, Jr., and Paul, Lawrence & Rock, Pittsburgh, Pa., on the brief), for petitioner.

Melvin Spaeth, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Asst. Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Samuel M. Singer, Atty., National Labor Relations Board, Washington, D. C., on the brief), for respondent.

Before GOODRICH, McLAUGHLIN and KALODNER, Circuit Judges.

KALODNER, Circuit Judge.

The instant case is one of many [1] growing out of a running jurisdictional dispute between the United Brotherhood of Carpenters and Joiners of America (Carpenters) and the International Association of Machinists (I.A.M.). Petitioner, Eichleay Corporation (Eichleay) was engaged in the performance of an independent contract to alter a hot mill for the American Brass Company in Kenosha, Wisconsin. In the performance of this contract, it was necessary to employ men to dismantle and remove or to erect and install machinery. A representative of Lodge No. 34, I.A.M., filed a charge with the Board, charging that Eichleay was discriminating in regard to the hiring of employees because of their membership in Lodge No. 34 and was granting preference to members of the Carpenters. Pursuant to that charge, a complaint was issued by General Counsel, charging a violation of Section 8(a) (1)

1. N.L.R.B. v. Arthur McKee & Co., 5 Cir., 1952, 196 F.2d 636; N.L.R.B. v. Oertel Brewing Co., 6 Cir., 1952, 197 F.2d 59; N.L.R.B. v. Whittenberg Const. Co., 6 Cir., 1952, 200 F.2d 157; N.L.R.B. v. Cantrall, 9 Cir., 1953, 201 F.2d 853; N.L.R.B. v. Local 743, United Broth. of Carpenters & Joiners of America, 9 Cir., 1953, 202 F.2d 516; N.L.R.B. v. Swinerton, 9 Cir., 1953, 202 F.2d 511.

and (3) of the Act.[2] The Board found that Eichleay had violated those sections by entering into and enforcing an oral agreement or understanding conditioning the hire and tenure of employment of millwrights upon membership in the Carpenters Union. The Board therefore ordered Eichleay to cease and desist from thus violating the Act, to post notices at its main office at Pittsburgh, Pennsylvania and at its project in Kenosha, Wisconsin, and to notify the Regional Director within ten days from the date of the order as to what steps it had taken to comply therewith. 102 N.L.R.B. No. 63.

The case is before this Court upon the petition of Eichleay to review and set aside the aforementioned order. In its answer the Board has requested enforcement.

Eichleay contends that it was not engaged in interstate commerce and that the Board therefore had no jurisdiction; that the Board's findings on the merits are not supported by substantial evidence; and that an affirmance of the order of the Board would not effectuate the policies of the Act. Its contentions will be discussed in the order stated.

### Jurisdiction

With respect to the question as to whether Eichleay was engaged in commerce[3] within the meaning of the Act, the record discloses that it transported over state lines about $20,000 worth of small tools. Four key men on the project were brought in from outside Wisconsin. Eichleay contends that $20,000 represents only 2% of the total value of the contract between it and American Brass, and that four men are only a small percentage of the total number of employees involved in the project.

In enacting the Labor-Management Relations Act Congress sought to exercise fully its power over interstate commerce.[4] The limits of that power are not to be defined solely by the extent of interstate activity involved in the particular case over which it is being asserted. In Polish National Alliance v. N.L.R.B., 1944, 322 U.S. 643, 648, 64 S.Ct. 1196, 1199, 88 L.Ed. 1509, Justice Frankfurter, speaking for the Court, said:

"Whether or no practices may be deemed by Congress to affect interstate commerce is not to be determined by confining judgment to the quantitative effect of the activities immediately before the Board. *Appropriate for judgment is the fact that the immediate situation is representative of many others throughout the country, the total incidence of which if left unchecked may well become far-reaching in its harm to commerce.*" (Emphasis supplied.) Cf. N.L.R.B. v. American District Telephone Co. of Pa., 3 Cir., 205 F.2d 86.

On that score the record establishes that Eichleay at the time of the hearing before

---

2. Labor-Management Relations Act, 29 U. S.C.A. § 158(a) (1) and (3) (1952 Supp.). The pertinent part of that Section is as follows:

"§ 158.

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\* \* \* \* \*

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization \* \* \*."

3. The contract with American Brass, over whom the Board has asserted jurisdiction, Hollow Tree Lumber Company, 91 N.L.R.B. 635, required Eichleay to render approximately $1,000,000 worth of services to American Brass. Whether these activities "affect" commerce materially, so as to be within the ambit of Congressional power regardless of whether they are themselves in interstate commerce, need not be decided in view of our determination that petitioner was engaged in interstate commerce.

4. N.L.R.B. v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893; N.L.R.B. v. Fainblatt, 1939, 306 U.S. 601, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014; Polish National Alliance v. N.L.R.B., 1944, 322 U.S. 643, 64 S.Ct. 1196, 88 L.Ed. 1509; Shore v. Building and Construction Trades Council, 3 Cir., 1949, 173 F.2d 678, 8 A.L.R. 2d 731.

the trial examiner, had similar contracts with other large companies in eight other states. Furthermore, the written agreement by which Eichleay agreed to "recognize the jurisdiction claims of the United Brotherhood of Carpenters and Joiners of America" was an "International Agreement", in effect in all the localities in which it was performing similar services. That circumstance, together with the fact that so many other Courts have had virtually identical factual situations before them within the past two years,[5] makes inescapable the conclusion that "the immediate situation is representative of many others throughout the country * * *", Polish National Alliance v. N.L.R.B., supra. Moreover, as this Court has observed in another case involving the construction industry:

"One small stoppage may not have an immediately perceptible effect upon the flow of the whole stream. But many small stoppages will have such effect * * * the power to regulate is not lost because of the small size of any individual contribution." Shore v. Building and Construction Trades Council, 3 Cir., 1949, 173 F.2d 678, 681, 8 A.L.R.2d 731.

We conclude therefore that the Board had jurisdiction over Eichleay.

### The Merits

Eichleay contends that the record as a whole does not substantiate the Board's conclusion. The following is a description of the hiring practices complained of, as appears from the uncontradicted testimony in the record:

On July 8, 1948, Eichleay and the United Brotherhood of Carpenters and Joiners of America entered into an agreement providing that the former agreed "to recognize the jurisdiction claims of the * * * Carpenters * * *, to work the hours, pay the wages and abide by the rules and regulations established or agreed upon by the Carpenters * * * of the locality in which any work * * * is being done, and employ members of the * * * Carpenters * * * In consideration of the foregoing, the * * * Carpenters * * * agree that no stoppage of work or any strike of its members, either collectively or individually, shall be entered into pending any dispute being investigated and all peaceable means taken to bring about a settlement."

In July of 1951, immediately before construction began, Mr. Johnson, field superintendent for Eichleay at the American Brass Company project, entered into an oral agreement with Mr. Byrne, business representative of the Carpenters, Local 161, by which it was understood that members of that local would be hired to do the carpentry and millwright work. It was a familiar hiring hall arrangement whereby any time there was a job available Johnson would call Byrne, and if a man was available he was sent on the job. Mr. Byrne testified as follows:

"Q. Now when you have during the past year received requests from Mr. Johnson for carpenters to work on the Eichleay job in Kenosha, did you ever send anyone to Mr. Johnson who was not a member of your union? A. No, I haven't.

"Q. Were there occasions during the past year when Eichleay needed men and asked you for some but you did not have any here in Kenosha? A. Well, sure there was at times.

"Q. What did you do to obtain those men? A. Called the Milwaukee Millwright Local and got them sent in from Milwaukee.

"Q. And when these men were sent in were they sent in as members of the millwright or carpenter local in Milwaukee? A. That is right.

* * * * * *

"Q. If they had not been members of the Carpenters Union they would not have been given working cards, is that correct? A. That is correct."

It was one of the working rules of Local 161 that members of the Carpenters Union would not work alongside nonmembers.

Mr. Johnson readily admitted the existence of such an understanding and an-

---

5. Note 1, supra.

swered "Yes, sir" to the question "From your experience, Mr. Johnson you are aware, are you not, that the Carpenters Union when called upon for help would refer only members of their organization?"

Before any actual hiring was done, Mr. Johnson was approached by Mr. Ritter and Mr. Young, Grand Lodge representatives of the I.A.M., and asked by them to hire members of the I.A.M. to do the millwright work. Their request was refused. On this score Mr. Johnson testified:

"I told them it had been my practice to hire millwrights who were members of the Carpenters and Joiners of America due to jurisdictional claims.

"In other words, I am hiring carpenters and iron workers, millwrights and so forth, laborers, and of course my contention was that if I hired Machinists, consequently I wouldn't have any carpenters working on my job. That is merely an assumption, no one ever told me I would or I wouldn't."

No member of the I.A.M. ever applied for a job on the project. The following colloquy appears in the record:

"Q. In the event that the Machinists had any people that had actually come to your office and asked you for work as millwrights you would not have hired them would you, unless they had been referred by Mr. Byrne?

\* \* \* \* \* \*

"A. I would possibly have referred the applicant to Mr. Byrne.

\* \* \* \* \* \*

"Q. You wouldn't hire a man, though, without referring him to Mr. Byrne first? A. No, it has always been our practice to procure men through the business agent of the respective trades."

In short, what we have here is a hiring hall arrangement where the union admittedly referred only members and Eichleay was aware of it.

Eichleay, however, contends (1) that there is no evidence that it was obliged to hire *only* Carpenters, and (2) that the finding that there was such an agreement was based on pure speculation, since no member of the I.A.M. ever applied for a job.

We agree with Eichleay that "The factor in a hiring-hall arrangement which makes the device an unfair labor practice is the agreement to hire *only* union members referred to the employer." Del E. Webb Construction Co. v. N.L.R.B., 8 Cir., 1952, 196 F.2d 841, 845. A referral system is not per se improper, absent evidence that the Union unlawfully discriminated in supplying the company with personnel. N.L.R.B. v. Swinerton, 9 Cir., 1953, 202 F.2d 511; Hunkin-Conkey Construction Co., 95 N.L.R.B. 433 (1951). But these established principles can be of no avail to Eichleay in this case, for the finding that it agreed to hire only union men was not based on "pure speculation" but on its field representative's testimony that if a member of the I.A.M. applied for a job he would not have hired him but would perhaps have sent him to the business agent of the Carpenters, knowing full well that the Carpenters referred only members of their own union. Having established a discriminatory hiring policy, it is of no moment that no member of the I.A.M. applied for a job, for "the execution of such an agreement, without more, tends to encourage membership in a labor organization \* \* \*" and is therefore violative of the Act. N.L.R.B. v. F. H. McGraw and Co., 6 Cir., 206 F.2d 635; Red Star Express Lines v. N.L.R.B., 2 Cir., 1952, 196 F.2d 78, 81; See Daniel Hamm Drayage Co., Inc., 84 N.L.R.B. 458, affirmed, N.L.R.B. v. Daniel Hamm Drayage Co., 5 Cir., 1951, 185 F.2d 1020; Arthur G. McKee and Co., 94 N.L.R.B. 399, 1951, affirmed, N.L.R.B. v. Arthur G. McKee & Co., 5 Cir., 1952, 196 F.2d 636. Given an agreement which discriminates in favor of the Carpenters' Union, and knowledge of that fact on the part of the I.A.M. members, it is certainly reasonable to conclude that no one applied because it appeared futile to do so, and that such agreement, in and of itself, encourages membership in the Carpenters' Union. We are of the opinion that Eich-

leay was guilty of an unfair labor practice when it entered into such an agreement.[6]

### The Policies of the Act

Adverted to in Eichleay's brief and strongly urged in oral argument before this Court was the contention that the enforcement of the Board's order would not effectuate the policies of the Act. Its contention in this respect grows out of the following circumstances:

Before the 1947 Act, the Board did not take jurisdiction over the construction industry[7] despite its hectic record of jurisdictional disputes. Some semblance of order was finally achieved within the industry in 1948, when a voluntary method of settling such disputes was successfully invoked.[8] The Board, by legislative mandate,[9] was compelled to assert jurisdiction over the industry under the new Act.[10] That Act outlawed not only the closed shop, an arrangement prevalent in the construction industry for many years, but, to all intents and purposes outlawed the union shop too. The union shop provisions of the new Act are singularly inappropriate for the construction industry.[11]

Given two unions, each of which claims exclusive jurisdiction over a certain type of work, it becomes readily apparent that the contractor-employer is in a difficult situation. If he agrees to give jobs to either union exclusively of the other, he violates the Act. If he attempts some sort of apportionment he may have no workers at all. Further, in order intelligently to submit a bid, a contractor must know his approximate labor costs, and construction unions are not prone to agree on wages and hours until guaranteed some type of union security clause.

At first blush it would seem that General Counsel could better effectuate the policies of the Act by initiating proceedings against the union which causes an employer to en-

---

6. Eichleay contends that under the provisions of Section 8(b) (4) (D) it is allowed discretion in assigning work to particular employees so as to avoid a jurisdictional dispute or strike. We agree with counsel for the Board that such contention is frivolous. Section 8(b) (4) (D) prohibits a union from resorting to such tactics as strikes and secondary boycotts to obtain work assignments but it does not purport to nullify Section 8(a) (3) by licensing the employer to make work assignments without first complying with union shop requirements of the latter section. Nor does it disallow a union from filing charges even if its motive is to gain jurisdiction over the work involved for Section 8(b) (4) (D) deals with certain prohibited *means* only, i.e. strikes and secondary boycotts. Because this is a public right we are enforcing, we may not concern ourselves with the motivation of the I.A.M. See opinion, infra.

7. Johns-Manville, 61 N.L.R.B. 1 (1945).

8. See AFL Building And Contruction Trades Department, Plan For Settling Jurisdictional Disputes Nationally And Locally 3 (1950) (the so-called "Green Book"). For prior efforts to find means of settling jurisdictional disputes in the industry see Haber, Industrial Relations in the Building Industry c. 7 (1930).

9. See, e. g., Wadsworth Bldg. Co., 81 N.L. R.B. 802, 804 (1949). The late Senator Taft stated that one of the purposes of the Act was to prevent jurisdictional disputes in the construction industries. 93 Cong.Rec.A 3370 (1947).

10. This was so even though the jurisdictional clauses in both Acts were identical. See The Impact of the Taft-Hartley Act on the Building and Construction Industry, 60 Yale L.J. 673 (1951).

11. Under section 9(e)(1), the union must file with the Board a petition alleging that at least 30% of the employees in an *appropriate unit* desire a union shop. The Board is given the task of determining what units are appropriate. To designate as an appropriate unit the members of a craft working for a single employer or on a single project creates special problems. For one thing, almost any decision based on such a unit, even if rendered with unprecedented speed, becomes obsolete as employees shift to other employers or the composition of the working force on a project changes. See N.L.R.B. v. Swinerton, 9 Cir., 1953, 202 F.2d 511. For cases where the Board, in an attempt to overcome these difficulties, endorsed election schemes based on a single craft, multi-employer bargaining unit, see Plumbing Contractor's Ass'n, 93 N.L.R.B. 1081 (1951), and Plumbing and Heating Contractor's Ass'n, 93 N.L.R.B. 1099 (1951).

ter into such illegal security agreements. Clearly such union is guilty of attempting "to cause an employer to discriminate against an employee in violation of subsection (a) (3) * * *." 29 U.S.C.A. § 158 (b) (2). Surely an order subjecting the union to contempt proceedings would seem to be more effective than an order against a single contractor in regard to a single project which is nearly always close to completion before the order is enforced by an appellate court.[12] But we are not called upon to decide whether the Board or General Counsel could have chosen more appropriate methods. We can concern ourselves only with the instant order. Does it effectuate the policies of the Act?

In our view, once it has been determined that the Board was correct in its determination that an unfair labor practice exists, we must enforce a cease and desist order, as distinguished from any other type of order, absent evidence of such a change in circumstances due to delay or other causes [13] which would make in inequitable to do so. N.L.R.B. v. Gonzalez Padin Co., 1 Cir., 1947, 161 F.2d 353.

We understand the language of Section 10(c),[14] 29 U.S.C.A. § 160(c), to mean that the Board *must* issue a cease and desist order once it has held a hearing and determined that a prohibited practice exists, but is allowed some discretion in ordering other "affirmative action", to wit, discretion to determine what will or will not effectuate the policies of the Act. In this latter allowable area of discretion,

while "It is for the Board not the courts to determine how the effect of prior unfair labor practices may be expunged", International Association of Machinists v. N.L. R.B., 1940, 311 U.S. 72, 82, 61 S.Ct. 83, 89, 85 L.Ed. 50, "nevertheless its power in this respect is subject to our control under § 10. May Dept. Stores v. National Labor Relations Board, 326 U.S. 376, 392, 66 S.Ct. 203, [90 L.Ed. 145]. * * *" N.L.R.B. v. Gonzalez Padin Co., supra [161 F.2d 358].[15] But our power of review over a simple cease and desist order is necessarily more limited, for whatever may be the broader policies of the Act, the compelling policy which we may not thwart is the Congressional determination that certain acts are illegal and must be enjoined.

But even if this were not so, we would still be constrained to enforce the Board's order. The Supreme Court has said that the Board's order "should stand unless it can be shown that * * * (it) is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Va. Electric Co. v. N. L.R.B., 1943, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568. "We must not, however, be more mindful of the limits of the Board's discretion than we are of our own limited function in reviewing Board orders." N.L.R.B. v. Gullett Gin Co., 1950, 340 U.S. 361, 362, 71 S.Ct. 337, 339, 95 L.Ed. 337.

It has not been established that the order involved is a "patent attempt" to achieve ends other than those which can fairly be

12. For cases where proceedings were initiated against the union, see N. L. R. B. v. Local 743, United Broth. of Carpenters & Joiners of America, 9 Cir., 1953, 202 F.2d 516; Del E. Webb Const. Co. v. N.L.R.B., 8 Cir., 1952, 196 F.2d 841; N.L.R.B. v. Oertel Brewing Co., 6 Cir., 1952, 197 F.2d 59.

13. N.L.R.B. v. Flotill Products, Inc., 9 Cir., 1950, 180 F.2d 441; See N.L.R. B. v. Norfolk Shipbuilding & Dry-Dock Corp., 4 Cir., 1949, 172 F.2d 813; Compare N.L.R.B. v. Red Arrow Freight Lines, Inc., 5 Cir., 1950, 180 F.2d 585.

14. "* * * If * * * the Board shall be of the opinion that any person named

in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board * * * shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter * * *."

15. For a recent case in which an order of the Board requiring reinstatement of an employee was not enforced because such order would not effectuate the policies of the Act, see N.L.R.B. v. Kingston Cake Company, Inc., 3 Cir., 206 F.2d 604.

said to effectuate the policies of the Act. As we have already said, Eichleay is guilty of an unfair labor practice. While we may be of the opinion that an order against it is not the *best* way to achieve a satisfactory result, we cannot say it is not a way, for it is not at all clear that the Board's order in the instant case will not have a tendency to discourage the making of illegal union security agreements.

We recently asserted that the weight to be given an administrative determination depends to a great extent upon the technicality of the problem before it. N.L.R.B. v. Kingston Cake Co., Inc., 3 Cir., 206 F.2d 604. In this connection it is important to note that whether an order against an employer having no legal compulsion upon the union, can have the effect of discouraging the practices complained of, would seem to depend largely upon the relative bargaining strength of employer and union. While the construction unions may not be "powder-puff" organizations, the Board may well have concluded that the General Contractors Association has a greater control over the situation than it is willing to admit. If so, then it is possible that the order in the instant case will tend to eliminate such illegal hiring practices, and thus effectuate the policies of the Act. Consideration of this and other related problems are peculiarly within the realm of the administrative experts, whose "day-to-day touch with the problems of labor relations gives them a unique feeling for the appropriate solutions to the novel questions in the field." N.L.R.B. v. Kingston Cake Co., Inc., supra. It is for this reason that we have been warned to "guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy." Phelps Dodge Corp. v. National Labor Relations Board, 1941, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271.

For these reasons we must say to Eichleay, as other Courts have said when faced with the problem,[16] that if it is aggrieved its remedy lies not in the Courts but in Congress.

 Nor may we, because the I. A. M. also claims exclusive jurisdiction and would probably have pursued the criticized practice if it had had the opportunity, invoke the doctrine of "clean hands", for "the doctrine does not apply since this is a proceeding by a governmental agency seeking enforcement of its order in the public interest." N.L.R.B. v. Kingston Cake Co., Inc. and Kingston Mutual Association, supra; Republic Steel Corp. v. N.L.R.B., 3 Cir., 1939, 107 F.2d 472, 479, modified on other grounds, 1940, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6.

For the reasons stated the petition to set aside the order of the Board issued on January 27, 1953, will be denied and the Board's prayer for enforcement [17] will be granted. A decree, denying the petition to set aside and enforcing the order of the Board, may be submitted.

---

16. N.L.R.B. v. Swinerton, 9 Cir., 1953, 202 F.2d 511, 516. See N.L.R.B. v. Hudson Motor Car Co., 6 Cir., 1942, 128 F.2d 528; Daniel Hamm Drayage Co., Inc., 84 N.L.R.B. 458, affirmed, National Labor Relations Board v. Daniel Hamm Drayage Co., 5 Cir., 1951, 185 F.2d 1020.

17. In its answer to Eichleay's petition to set aside its order, the Board requested its enforcement.