228 F.2d 702
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
DALLAS GENERAL DRIVERS, WAREHOUSEMEN AND HELPERS, LOCAL
UNION 745, INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF
AMERICA, AFL, Respondent.
 No. 15589.
 United States Court of Appeals Fifth Circuit.
 Jan. 17, 1956.
 
 Norton J. Come, Atty., Marcel Mallet-Prevost, Asst. Gen. Counsel, Theophil C. Kammholz, Gen. Counsel, David P. Findling, Associate Gen. Counsel, Robert G. Johnson, Atty., N.L.R.B., Washington, D.C., for petitioner.
 L. N. D. Wells, Jr., Houston Clinton, Jr., Mullinax & Wells, of Dallas, Tex., for respondent.
 
 
 1
 Before BORAH and JONES, Circuit Judges, and DAWKINS, District Judge.
 
 
 2
 DAWKINS, District Judge.
 
 
 3
 The Board petitions for enforcement of its order against the respondent union, growing out of unfair labor charges filed by four employees of North East Texas Motor Lines, Inc., an interstate trucking concern, herein called the Company. The charges were made against both the Company and the Union, and the Board's order was directed to both. However, since the Company has undertaken to comply, the Board petitions for enforcement only as against the Union. The order is based upon the Board's finding that the Union violated Section 8(b)(2) and 8(b)(1)(A) of the National Labor Relations Act, 29 U.S.C.A. § 158(b)(2), (1) (A), by causing the company to discriminate against the four employees and by maintaining and enforcing a provision of its collective bargaining contract.
 
 
 4
 The contract was known as 'Southwestern Area Over-The Road Motor Freight Agreement,' effective February 1, 1952, through January 31, 1955; and it contained seniority provisions quoted in the margin.[1] Contracting parties were several local unions of the International Brotherhood of Teamsters, etc., and a group of interstate trucking firms. One of the employer firms was the Company's predecessor which operated its Texas business out of terminals located at Dallas, Greenville, Sherman and Paris. The drivers operating out of Dallas, Greenville and Sherman were members of and represented by the respondent Union, while Paris drivers belonged to and were represented by Local No. 848 of Little Rock, Arkansas.
 
 
 5
 In May, 1953, when the Company acquired the business of its predecessor, it decided to expand the Dallas terminal and close the terminals at Greenville, Sherman and Paris; and drivers operating from these latter points were given an opportunity to move to Dallas not later than June 22nd. By agreement of the two local unions, in which the Company assented, it was determined that transfer would be made on the basis of terminal seniority,[2] but apparently no formal decision was made as to the arrangement of seniority upon arrival in Dallas.
 
 
 6
 On June 22nd, under the direction of representatives of the respondent Union, the Company's supervisor prepared a seniority list for all drivers then operating out of the Dallas terminal. The five drivers who had been at Dallas when the transfers were begun were placed at the head of the list; they were followed by drivers from Sherman and Greenville in the order of company seniority; and the Paris drivers as a group were placed last on the list. Two additional or supplementary seniority lists were prepared on July 24th and September 2nd, and the Paris drivers as a group remained at the bottom of both. Subsequent to their arrivals in Dallas and the posting of seniority lists, all of the Paris drivers became members of respondent local.
 
 
 7
 The Trial Examiner found that the italicized portions of Section 2 of the contract, quoted in footnote 1, was violative of the Act as held in Pacific Intermountain Express Co., 107 N.L.R.B. 837 and that the acts of the Union in forcing the Company to place Paris drivers at the bottom of the list irrespective of the dates of their arrivals in Dallas constituted discrimination against the Paris drivers and in favor of those from Greenville and Sherman. With modifications not relevant here, the Board upheld his findings. The issues presented may be summarized: (1) Does the six-month limitation of Section 10(b) of the Act, 29 U.S.C.A. § 160(b) apply; (2) Does the record as a whole support the finding of discrimination against the Paris drivers; and (3) Are the contract provisions violative of the Act?
 
 I.
 
 8
 The charges were served upon respondent on December 23, 1953, and it vigorously urges that any discrimination proved occurred not later than June 22nd of that year, thus bringing into effect the six-month bar or limitation period prescribed in Section 10(b) of the Act. The argument is that by June 22nd all drivers had been transferred to Dallas and all decisions with respect to seniority had been made; that the seniority list prepared and posted on June 22nd is therefore the only basis for a charge of discrimination, since the only changes made on the supplementary lists were within the Paris group, citing primarily the decisions of this Court of American Federation of Grain Millers, A.F. of L. v. N.L.R.B., 5 Cir., 197 F.2d 451, and N.L.R.B. v. Newton, 5 Cir., 214 F.2d 472, and the Board's own decision in Bowen Products, 113 N.L.R.B. 63.
 
 
 9
 The Board made no specific holding on this point, but affirmed the rulings of the Trial Examiner. The latter considered that the contract provisions were discriminatory and violative of the Act and that maintenance and enforcement of those provisions constituted a continuing violation of the Act.
 
 
 10
 We agree with the Trial Examiner that the cases relied upon by respondent are not apposite here. The unfair practice upon which the charge was based in the Grain Millers case was the refusal of the employer to bargain; and this Court merely held that the original refusal, occurring outside the six-month period, did not create a continuing violation where no further request to bargain was made by the employees or their Union. In the Newton case, this Court simply held that the Board could not include in its complaint an allegedly discriminatory discharge of an employee which occurred more than six months prior to the service of the charge. In the Bowen Products case, the Board itself distinguished the type of situation presented here.
 
 
 11
 There arose a controversy about the placement of the Paris drivers on the seniority list of June 22nd, and it continued for some time. The Union made or caused to be made new seniority lists in July and September, well within the six-month period, and on each of these lists the Paris drivers were again placed in a group at the bottom, following all Greenville and Sherman drivers. While the Union urges that changes were made only within the Paris group and that the placement of the group was pursuant to the course of action decided upon on or before June 22nd, we think that the preparation and posting of new and revised lists were entirely separate and distinct acts from those of June 22nd, and if discriminatory or otherwise violative of the Act, could be prosecuted in this proceeding.
 
 
 12
 Moreover, if the contract provision giving the Union sole power to settle seniority disputes violated the Act, or if the Union exercised that power discriminatorily, each time it did so constituted a separate and distinct act, whether or not the decision so to act was made outside the six-month period. See N.L.R.B. v. George D. Auchter Co., 5 Cir., 209 F.2d 273. The Eighth Circuit so held in an almost identical case, N.L.R.B. v. International Brotherhood of Teamsters, etc., 225 F.2d 343.
 
 II.
 
 13
 Dunn, a stockholder and the line driver supervisor of the Company, testified that he made up the June 22nd and July 24th seniority lists at the express direction of Stanford, business agent for the respondent local, and that Stanford himself prepared the list of September 2. Further, Dunn stated that in so far as he was concerned there was no over-all pattern for determining relative seniority between Paris drivers and those from Greenville and Sherman, and that the Paris drivers were placed at the end of all lists only because Stanford so directed.
 
 
 14
 Stanford did not deny that he directed Dunn in the making of the first two lists, nor that he himself prepared the final list. He did deny an intention to discriminate against Paris drivers, and explained that mistakes in the ranking of Paris drivers resulted from erroneous information from the company as to dates of arrival in Dallas.[3] However, both the trial examiner and the Board found such testimony incredible.
 
 
 15
 No useful purpose will be served by further discussion of the testimony, for we are of the opinion that the Trial Examiner was fully justified in crediting Dunn's testimony over that of Stanford,[4] and a review of the record as a whole convinces us that the Board's findings are amply supported by the evidence. Indeed, we think that the inference of a discriminatory motive is eminently sound in this case.
 
 
 16
 The contract itself provided for terminal rather than company seniority. Yet, the three lists posted prior to the hearing clearly show that only Dallas drivers were listed according to terminal seniority. Greenville and Sherman drivers were arranged among themselves according to company seniority, as were Paris drivers, but all Paris drivers were placed below Greenville and Sherman drivers in spite of the fact that some of the former had company seniority over some of the latter and also arrived at the Dallas terminal earlier. It would be difficult to present a clearer showing of discrimination; and since the Union had insisted upon and exercised the right to control seniority, it is too much to overlook as coincidental the fact that all non-members of the respondent local were listed below its members.
 
 III.
 
 17
 In Firestone Tire & Rubber Co., 93 N.L.R.B. 981 (1951), the Board held that a contract provision granting to the union supervision and control over seniority controversies was lawful. This ruling was in effect when the contract in this case was negotiated, and when the unfair labor charges were filed. However, on January 14, 1954 (before the original hearing in the instant case) in Pacific Intermountain Express Company, 107 N.L.R.B. 837, enforced as modified N.L.R.B. v. International Brotherhood of Teamsters, etc., 8 Cir., 225 F.2d 343, the Board reversed the Firestone decision and, after pointing out that the objective standards for determining seniority are derived from information peculiarly within the knowledge of the employer, held:
 
 
 18
 'We can therefore see no basis for presuming that when an employer delegates to a union the authority to determine the seniority of its employees, or even to settle controversies with respect to seniority, such control will be exercised by the union in a non-discriminatory manner. Rather, it is to be presumed, we believe, that such delegation is intended to, and in fact will, be used by the union to encourage membership in the Union. Accordingly, the inclusion of a bare provision, like that in the contract, that delegates complete control over seniority to a union is violative of the Act because it tends to encourage membership in the Union. And because we believe that it will similarly tend to encourage membership in the union, we also conclude that the inclusion of a statement, like that in the contract, that seniority will be determined without regard to union membership, is not by itself enough to cure the vice of giving to the Union complete control over the settlement of a 'controversy' with respect to seniority.'
 
 
 19
 We think this pronouncement is sound and the instant case furnishes a vivid illustration of abusive use of such power by a union. Further, we agree with the Eighth Circuit that the Board has authority to interpret contract provisions in the light of the purposes of the Act and to declare its policies for the guidance of interested parties. It is true, as respondent contends, that the Board is not empowered to dictate the provisions of collective bargaining agreements, nor are the courts; but in seeking to provide a fair and unfettered atmosphere in which labor-management problems might be resolved, the Act concerns itself with the possibility that by coercive devices one party or group might seek to obtain an unfairly advantageous position. The Act therefore secures to employees freedom of choice in determining, for example, whether or not to organize or to join a labor organization, and it prohibits any acts or practices which interfere with or in any way coerce employees in exercising the rights so guaranteed. In pursuing their statutory duties of enforcing these purposes, the Board and the courts are often confronted with the necessity to pass upon the validity of contract provisions, for, as seen in this and other cases, such provisions can and often do create devices by which the purposes of the Act are thwarted.[5] Such action is quite distinct from 'sitting in judgment' on the substantive provisions of collective bargaining agreements, as the Board demonstrated in this case when it recognized the right of the parties to follow terminal rather than company seniority even when it appeared inequities might result.
 
 
 20
 When a contract provision is properly found violative of the Act, the power to prohibit its continued enforcement by the parties to the controversy is essential. We therefore approve the order to cease and desist from performing or giving effect to that portion of the contract which delegates to the respondent Union authority to settle controversies relating to seniority. However, we cannot approve that portion of the order which seeks to prohibit the Union from entering into or renewing any such agreement with any employer, for we think such action does not relate to the particular unfair labor charges being prosecuted here and therefore exceeds the power of the Board.
 
 
 21
 The Board's order is modified by deleting therefrom paragraph II(a)(2), together with that portion of the notice (Appendix 3) based thereon. So modified, it is
 
 
 22
 Enforced.
 
 
 
 [1]
 'Section 2. A list of employees in the order of their seniority shall be posted in a conspicuous place, at their place of employment. Any controversy over the seniority standing of an employee on this list shall be referred to the Union for settlement. Such controversy shall be settled without regard to whether the employees involved are members or not members of a Union
 'Section 3. Vacancies, new runs and new positions are subject to seniority and shall be posted for bids. The employee with the highest seniority who bids shall receive such vacancy, new run or new position. Posting shall be at a conspicuous place so that all eligible employees will receive notice of the vacancy, run or position open for bid. Bids shall remain open for a period of seven days thereafter. Seniority shall not govern assignment of equipment.
 'Section 4. Terminal seniority shall prevail except where all Local Unions and a Company involved mutually agree otherwise.'
 
 
 [2]
 Although it was alleged that the offers of opportunity to transfer to Dallas were made discriminatorily, the Trial Examiner found no evidence of such discrimination, and the Board upheld his finding. For the same reason, we are not presented with the issue raised below that there was discrimination in basing new seniority ratings upon arrival date at Dallas rather than upon time with the Company
 
 
 [3]
 Respondent argues here that the seniority lists after transfers to Dallas were intended to be prepared on the basis of arrival dates at the Dallas terminal. It contends that the evidence shows the company kept inadequate or erroneous records, which caused the improper placement of Paris drivers at the bottom of the lists. However, it was from the company records that the correct listing agreed upon during the hearing was derived, and the Trial Examiner accorded weight to the Union's failure to seek information from the Company
 
 
 [4]
 It is noted that Dunn was an officer of the Company, which was also a respondent in the proceedings. Further, the Trial Examiner discredited the testimony of several witnesses for the General Counsel, and this record does not reflect unfair uniformity of credibility rulings
 
 
 [5]
 See, for example, N.L.R.B. v. George D. Auchter Co., supra; Red Star Express Lines v. N.L.R.B., 2 Cir., 196 F.2d 78; Katz v. N.L.R.B., 9 Cir., 196 F.2d 411; N.L.R.B. v. F. H. McGraw & Co., 6 Cir., 206 F.2d 635; Eichleay Corp. v. N.L.R.B., 3 Cir., 206 F.2d 799